**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **DANIEL D. DILLARD,** | § | |
| **TDCJ No. 1400285,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:19-cv-00081-M-BP** |
| | § | |
| **LORIE DAVIS,** *et al.***,** | § | |
| | § | |
| **Defendants.** | § | |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**</u>

Daniel Dillard is a state inmate who claims employees of the Texas Department of Criminal Justice ("TDCJ") violated his rights under the First, Eighth, and Fourteenth Amendments of the United States Constitution. He proceeds *pro se* and *in forma pauperis*. ECF Nos. 1, 5. Before the Court are cross motions for summary judgment (ECF Nos. 124, 152), the parties' replies (ECF Nos. 168, 173), and a motion to intervene. ECF No. 189. For the following reasons, the undersigned **RECOMMENDS** that Chief United States District Judge Barbara M. G. Lynn partially **GRANT** and **DENY** Defendants' motion (ECF No. 124), **DENY** Dillard's motion (ECF No. 152), and **DENY** the motion to intervene. ECF No. 189. The undersigned further **RECOMMENDS** that Chief Judge Lynn **SET** this case for trial.

**I.     BACKGROUND**

**A.     Plaintiff**

Dillard is confined in TDCJ's Mark Michael Unit in Tennessee Colony, Texas. *See Inmate Information Details: Dillard, Daniel Denard*, TEX. DEP'T OF CRIM. JUST., https://inmate.tdcj.texas.gov/InmateSearch/viewDetail.action?sid=06683229 (last visited June 17, 2022). He

has been serving a life sentence without parole since 2006, when a Harris County jury found him guilty of capital murder. *Id.*; *see also Dillard v. State*, No. 14-06-00940-cr, 2007 WL 3342029, at *1 (Tex. App.—Hous. [14th Dist.] Nov. 13, 2007) (affirming Dillard's judgment of conviction); Fed. R. Evid. 201(b) (stating a court may take judicial notice of facts not subject to reasonable dispute). The events giving rise to this lawsuit began roughly twelve years later in October 2018, when Dillard was an inmate at TDCJ's George Beto Unit.

  **B.**  **The Fight**

  On October 8, 2018, a fight erupted inside the Beto Unit involving Dillard and Olamigoke Omisore, a TDCJ officer not a party to this litigation. *See* ECF No. 124-5 at 3. What happened immediately before the fight is unclear. During the fight, Dillard allegedly punched Omisore "with a closed fist approximately 5 times knocking Officer Omisore to the floor," where Dillard punched him twice more. *Id.*

  Defendant Shon McGee, a TDCJ lieutenant, responded to the scene and tried subduing Dillard by spraying him with "1.3 ounces of Sabre Red," an aerosol chemical agent. *Id.* After the fight, Omisore had "several injuries," including "swelling to the facial area and possible orbital fracture," and was transported via helicopter to a hospital. *Id.* Dillard had a "laceration to the left forefinger" and was taken to the prison infirmary. *Id.*

  TDCJ investigated both Dillard and Omisore for disciplinary violations. ECF No. 124-6 at 8 ("Employee Offense and Prehearing Investigation Report"). TDCJ found Omisore's actions "Inappropriate" and anticipated a hearing to review Omisore's conduct for an "Alleged violation of departmental rules/regulations." *Id.* at 9-10. Omisore resigned before TDCJ conducted that hearing or concluded its investigation. *Id.* at 3, 5. It is unclear to what extent Omisore recovered from his injuries during the incident.

TDCJ removed Dillard from the general inmate population, transported him off the Beto Unit, and placed him in pre-hearing detention. ECF No. 124-5 at 3. McGee later filed an Offense Report accusing Dillard of assaulting Omisore. ECF No. 124-7 at 68.

### C.     The Disciplinary Hearings

TDCJ moved Dillard to the James Allred Unit, where he was a party to disciplinary hearings held on November 6 and 16, 2018 concerning the assault. ECF No. 86 ¶¶ 51, 58. Dillard pleaded not guilty at both. *See* ECF No. 124-7 at 67 (second hearing). The first hearing was apparently dismissed without any consequence to Dillard. ECF No. 86 ¶ 35. At the second, Dillard was found guilty of assaulting Omisore "by punching him with closed fist several times" and causing "injuries that required treatment beyond first aid." ECF No. 124-7 at 67.

No witnesses testified for Dillard, and he was "denied video evidence." *Id.* at 79. One witness, McGee, testified via telephone against Dillard. *See id.* at 67, 79; ECF No. 86 ¶ 36. McGee's testimony and Offense Report are the only evidentiary items cited in the disciplinary finding of Dillard's guilt (ECF No. 124-7 at 67-68), which was not appealable. *Id.* at 79. Dillard's punishment included lost commissary and recreation privileges, and 1,562 days in "good time lost." ECF No. 124-7 at 67, 79. His line class was reduced from S3 to L3. *Id.* His custody status changed from pre-hearing detention to administrative segregation, a status which remains in effect today. ECF No. 86 at 1; *see also* ECF No. 124 at 9, 22; ECF No. 124-3 at 9.

### D.     Administrative Segregation/Restrictive Housing

In 2019, TDCJ changed the "administrative segregation" designation to "restrictive housing" and implemented a "Restrictive Housing Plan" to replace the former "Administrative Segregation Plan" and its rules and procedures. *See* ECF No. 124-4 at 3-4. Throughout his pleadings, Dillard references his confinement in "administrative segregation/restrictive housing,"

often abbreviating the names to "ad. seg./res. hou." *See, e.g.*, ECF No. 86. No meaningful difference exists between the two confinement types or their corresponding plans, and Defendants do not suggest otherwise. *See* ECF No. 124 at 9 n.3, 11. Accordingly, the undersigned collectively references administrative segregation and restrictive housing as "RH."

### E.     RH Confinement Conditions

Dillard's continuous RH confinement now spans over three-and-a-half years under conditions he describes as "so close to solitary confinement that the differences are indistinguishable." ECF No. 86 ¶ 127; *see also* ECF No. 211 at 4 (Dillard stating his RH confinement is now "over three (3) and a half (1/2) years."); ECF No. 124-7 at 13 (Defendants indicating Dillard was initially placed in RH in October 2018). Dillard says the conditions "are meant to physically, psychologically, and emotionally break human beings" (ECF No. 86 ¶ 126), and he submits he is now "mentally unstable" and on the "psych case load." ECF No. 168 at 23.

Dillard alleges four TDCJ correctional officers—James Bullard, Jayton Chavers, Dakota Denney, and Gregory Fredricks—have made his RH confinement worse by depriving him of meals, showers, and exercise, causing Dillard to lose over 130 pounds. ECF No. 86 ¶ 75. Dillard asserts, "I have watched myself physically waste away." ECF No. 13 at 3. Further, in January 2021, Dillard contracted COVID-19 and became ill with "agonizing chest pains," "could not get out of bed," and "was under the impression that he would die in the cell." ECF No. 86 ¶¶ 122, 124. He claims he received no medical care after contracting the virus. *Id.* ¶ 123.

### F.     Procedural History

Dillard first petitioned the Court for a writ of habeas corpus under 28 U.S.C. § 2254 in February 2019, asserting procedural due process violations relating to the second disciplinary hearing. *See Dillard v. Director*, No. 7:19-cv-00022-M-BP, 2019 WL 5967875 (N.D. Tex. Oct.

29, 2019), *rec. adopted*, 2019 WL 5963902 (N.D. Tex. Nov. 13, 2019). While his petition was pending, Dillard filed this action under 42 U.S.C. § 1983. ECF No. 1. The Court entered judgment denying Dillard's habeas petition because his claims were not actionable under § 2254. *See Dillard*, 2019 WL 5967875, at \*2-3; *see also id.*, 2020 WL 4938663 (N.D. Tex. July 22, 2020) (recommending denial of motions for post-judgment relief), *rec. adopted*, 2020 WL 4933563 (N.D. Tex. Aug. 24, 2020). In denying Dillard habeas relief, the Court noted it was considering this separate § 1983 suit. *See id.*, 2020 WL 4933563.

Dillard's Verified First Amended Complaint (ECF No. 86, the live pleading) asserts constitutional violations under the First, Eighth, and Fourteenth Amendments. Dillard seeks judgment against the following eighteen TDCJ employees ("Defendants"):

Lorie Davis, former Director of the Correctional Institutions Division ("CID"), in her individual capacity, for damages on all claims;

Bobby Lumpkin, current CID Director, in his official capacity, for injunctive relief relating to all claims;

Jimmy Smith, Allred Unit Senior Warden, in his individual capacity for damages on all claims, and in his official capacity for injunctive relief relating to all claims;

Elbert Holmes and Andrea Lozada, former Allred Unit Assistant Wardens, in their individual capacities for damages on all claims;

Michael Feazell and Timothy Hooper, current Allred Unit Assistant Wardens, in their official capacities for injunctive relief relating to all claims;

Bryan Reitsma, an Allred Unit Major, in his individual capacity, for damages due to Fourteenth Amendment violations;

Timothy Washington, an Allred Unit Major, in his individual capacity, for damages on all claims;

Shon McGee, a correctional lieutenant, and Cody Miller, a disciplinary captain, in their individual capacities, for damages due to First Amendment violations;

James Bullard, Jayton Chavers, Dakota Denney, Gregory Fredricks, correctional officers, in their individual capacities, for damages due to First and Eighth Amendment violations; and

Lavonda McLemore, Jose Mares, and Bridgette Smalley, correctional officers, in their individual capacities, for damages due to Fourteenth Amendment violations.

ECF No. 86 ¶¶ 9-18; *see also* ECF No. 157 at 5-6 (granting Dillard's motion for leave to amend to sue Smalley and Mares in their individual capacities only).

Several defendants filed motions to dismiss (ECF Nos. 112, 137), which the Court denied. *See Dillard v. Davis*, No. 7:19-cv-00081-M-BP, 2022 WL 329984 (N.D. Tex. Jan. 6, 2022), *rec. adopted*, 2022 WL 326567 (N.D. Tex. Feb. 3, 2022). The Court later dismissed three defendants: McLemore, Mares, and Smalley. *Id.*, 2022 WL 1096368 (N.D. Tex. Mar. 24, 2022), *rec. adopted*, 2022 WL 1092929 (N.D. Tex. Apr. 12, 2022); *see also* ECF No. 207 ("Final Judgment as to Certain Claims").

Thirteen of the remaining fifteen Defendants move for summary judgment, asserting qualified immunity and contending they did not violate Dillard's constitutional rights. ECF No. 124. The undersigned construes the motion as also seeking the same relief for the two non-moving defendants (Feazell and Hooper) and below will recommend granting them summary judgment and dismissal. The Court otherwise has authority to *sua sponte* dismiss them under 28 U.S.C. § 1915(e)(2)(B). Dillard moves for partial summary judgment only on his Fourteenth Amendment claim. ECF No. 152. Inmate Jeremy Busby filed the motion to intervene in February 2022. ECF No. 189. These motions are ripe for review.

## II.    LEGAL STANDARDS

### A.    42 U.S.C. § 1983

Section 1983 creates a remedy against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution." A plaintiff "must first show a violation of the Constitution," and "then show that the violation was committed by someone acting under color of state law.'" *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008) (quoting *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252-53 (2005)). Defendants here do not contest the "under color" requirement. *See* ECF No. 124.

Concerning the first requirement, Dillard alleges three categories of constitutional violations: (1) retaliation violating the First Amendment; (2) cruel and unusual confinement conditions violating the Eight Amendment; and (3) confinement without due process of law violating the Fourteenth Amendment. *See* ECF No. 86; *Hope v. Harris*, 861 F. App'x 571, 576 (5th Cir. 2021) (similarly construing a *pro se* inmate's complaint).

### 1.    First Amendment: Retaliation

The First Amendment protects an inmate's right "to petition the Government for a redress of grievances." U.S. CONST. amend. I. "Prison officials may not retaliate against prisoners for exercising their . . . First Amendment right to file grievances, as retaliation has the potential to discourage exercising that right." *Butts v. Martin*, 877 F.3d 571, 588 (5th Cir. 2017). Accordingly, "[r]etaliation claims are actionable under § 1983." *Id.* at 589.

### 2.    Eighth Amendment: Cruel and Unusual Confinement

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. CONST. amend. VIII. "The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones, and it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citation omitted) (quoting two sources).

"Section 1983 is an appropriate legal vehicle to attack unconstitutional . . . conditions of confinement." *Cook v. Tex. Dep't of Crim. Just.*, 37 F.3d 166, 168 (5th Cir. 1994).

### 3.    Fourteenth Amendment: Due Process

The Fourteenth Amendment prohibits "any State" from depriving "any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. "Prisoners may also claim the protections of the Due Process Clause." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). In a procedural due process case like this one, "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (stating a "§ 1983 action may be brought for a violation of procedural due process.").

### B.    Theories of Liability Under § 1983

A "plaintiff bringing a [§] 1983 action must specify the personal involvement of each defendant." *Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992). This is because § 1983 "does not create supervisory or *respondeat superior* liability." *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002). Consequently, the plaintiff must demonstrate an affirmative link between the constitutional violation and an act of each defendant he sues. *Murphy*, 950 F.2d at 292 n.7.

A supervisor may be liable "only if: (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)). Further, "[u]nder *Ex parte Young*, a case can proceed against individual state officials named in their official capacities when the claim is for an ongoing violation of federal law, but the relief sought must be prospective."

*Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021) (quoting *Daves v. Dall. Cnty., Tex.*, 984 F.3d 381, 397 (5th Cir. 2020)).

### C.    Federal Rule of Civil Procedure 56: Summary Judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Fact disputes are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Burgos v. Sw. Bell Tel. Co.*, 20 F.3d 633, 635 (5th Cir. 1994). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007). When a movant carries his initial burden, the burden shifts to the nonmovant to show summary judgment would be improper. *Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir. 1992).

The Court must view summary judgment evidence in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court considers the full record including the pleadings, depositions, interrogatory answers, admissions, and affidavits. Fed. R. Civ. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). However, the Court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### D.    Qualified Immunity

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting

9

*Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Siegert v. Gilley*, 500 U.S. 226, 231 (1991) (stating qualified immunity "must be pleaded"). It is an "*immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

The Court considers: "(1) whether the facts that a plaintiff has shown establish a violation of a constitutional right; and (2) whether the right was clearly established at the time of the defendant's alleged misconduct." *Wilkerson v. Goodwin*, 774 F.3d 845, 851 (5th Cir. 2014). The second prong involves "two separate inquiries: whether the allegedly violated constitutional rights were *clearly established at the time of the incident*; and, if so, whether the conduct of the defendants was objectively unreasonable in the light of that then clearly established law." *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (1998). To be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

### E.    Summary Judgment Revisited

#### 1.    Qualified Immunity

"A qualified immunity defense alters the usual summary judgment burden of proof," shifting it "to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." *Harlow*, 457 U.S. at 818. The Court considers the defense for each defendant individually. *Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007).

###   2.     Inmate Litigation

Courts employ summary judgment cautiously in the context of *pro se* inmate litigation. *Murrell v. Bennett*, 615 F.2d 306, 309 (5th Cir. 1980). They must "guard against premature truncation of legitimate lawsuits merely because of unskilled presentations." *Id.* at 311; *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (stating *pro se* documents should be liberally construed). "Indigent prisoners are hampered in their access to the proof necessary to ward off summary judgment." *Murrell*, 615 F.2d at 310. Accordingly, "on summary judgment, factual allegations set forth in a verified complaint may be treated the same as when they are contained in an affidavit." *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003). Further, the inmate's "other verified pleadings serve as competent summary judgment evidence." *Falcon v. Holly*, 480 F. App'x 325, 326 (5th Cir. 2012) (citing *Hart*, 343 F.3d at 765). Under these authorities, the Court views Dillard's verified complaint, declarations, pleadings, and other filings (*see* ECF Nos. 13, 15, 20-21, 24, 44, 86, 151, 168) as competent summary judgment evidence.

### III.   ANALYSIS

All Defendants properly pleaded qualified immunity (ECF No. 108 at 3) and assert the immunity in their motion. ECF No. 124 at 23. They also insist Dillard "fail[s] to establish that Defendant[s] violated any of his constitutional rights." *Id.* at 16. The undersigned examines the Defendants' assertions of qualified immunity to Dillard's claims under the Fourteenth, First, and Eighth Amendments; Dillard's requested relief; and Busby's motion to intervene.

### A.     Fourteenth Amendment: Confinement Without Due Process of Law

Dillard asserts procedural due process violations against Bryan Reitsma, who presided over the November 16 hearing that found Dillard guilty of assaulting Omisore and placed him in RH. *See* ECF No. 86 at 23-25. Dillard also asserts due process claims against Lorie Davis, Jimmy Smith, Elbert Holmes, Andrea Lozada, Bobby Lumpkin, Michael Feazell, Timothy Hooper, and

Timothy Washington. *See id.* At issue is whether Reitsma deprived Dillard of the "minimum requirements of procedural due process" owed in prisoner disciplinary proceedings before finding him guilty and placing him in RH. *See Wolff*, 418 U.S. at 563. If so, the next issue is whether the other defendants sued may be held liable.

### 1.    The *Heck v. Humphrey* Doctrine

At the outset, the defendants argue § 1983 is not a proper vehicle for Dillard's due process challenge because it is barred by the Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), as applied in *Edwards v. Balisok*, 520 U.S. 641 (1997). ECF No. 173 at 1-2. The defendants submit that because Dillard lost good-time credits at his disciplinary hearing, his sole avenue to challenge the hearing was through a habeas corpus proceeding. *Id.*; *see also* ECF No. 185 at 1-2 (Dillard's Reply). The defendants' argument is unavailing.

The *Heck* doctrine precludes inmates from recovering damages under § 1983 for an allegedly unconstitutional "conviction or sentence" without first showing the conviction or sentence has been invalidated. *See* 512 U.S. at 486-87. The rationale is that such a constitutional challenge to one's conviction or sentence sounds in habeas, not in tort, of which § 1983 is a species. *See id.* at 483-86. An inmate's § 1983 suit is thus *Heck*-barred to the extent a favorable judgment "would necessarily imply the invalidity of his conviction or sentence." *Id.* at 487.

In *Edwards*, the Supreme Court applied *Heck* to an inmate's § 1983 procedural due process challenge arising from a disciplinary proceeding that found him guilty of infractions and sentenced to "10 days in isolation, 20 days in segregation, and deprivation of 30 days' good-time credit he had previously earned toward his release." 520 U.S. at 643. The Court found the deprivation of good-time credit implicated *Heck* because generally "the sole remedy in federal court for a prisoner seeking restoration of good-time credits is a writ of habeas corpus." *See id.* at 643-44 (citing

*Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973)). The Court in *Preiser* reasoned that application of good-time credits may reduce the sentence duration of an inmate's physical imprisonment, and if a § 1983 judgment restored those credits, the restoration would effectively imply the invalidity of the inmate's prior sentence duration, a remedy that sounds in habeas, not § 1983. *See Preiser*, 411 U.S. at 500.

The inmate in *Edwards* strategically "did not request restoration of the lost credits," to avoid implicating *Preiser*. *See Edwards*, 520 U.S. at 643-44. Even so, the Court denied relief because the "principal procedural defect complained of by [the inmate] would, if established, necessarily imply the invalidity of the deprivation of his good-time credits." *Id.* at 646. The inmate complained that a biased officer presided over his disciplinary hearing and denied him an opportunity to call exculpatory witnesses. *Id.* at 646-47. Because the inmate alleged "deceit and bias on the part of the decisionmaker that necessarily imply the invalidity of the punishment imposed," § 1983 was an improper avenue for relief. *Id.* at 648.

The defendants submit Dillard's due process claim resembles the facts of *Edwards*, thus triggering a *Heck*-bar. ECF No. 173 at 1-2 & n.5. Their argument is at first compelling since Dillard challenges a disciplinary hearing where he was allegedly denied the opportunity to call exculpatory witnesses. *See* ECF No. 124-7 at 79. The hearing apparently resulted in Dillard losing 1,562 days of "good time." *Id.* at 67, 79. The defendants argue that although Dillard does not request restoration of the good-time credits (*see* ECF No. 86 at 27-30), success in his § 1983 suit would imply the invalidity of his losing the credits. The defendants further reason there is no indication Dillard's conviction for assaulting Omisore has been invalidated, so Dillard's "sole remedy for challenging his conviction or sentence is a habeas corpus petition." *See* ECF No. 173 at 2.

The defendants' argument is not persuasive because the relevant "conviction or sentence" for purposes of *Heck* is not Dillard's November 2018 disciplinary hearing, but his underlying conviction for capital murder in 2006. "[T]he incarceration that matters under *Heck* is the incarceration ordered by the original judgment of conviction, not special disciplinary confinement for infraction of prison rules." *Muhammad v. Close*, 540 U.S. 749, 751 n.1 (2004). The November 2018 disciplinary proceeding is relevant only as it affects the underlying sentence duration imposed by the 2006 conviction. *See Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005) (quoting *Preiser*, 411 U.S. at 489). And the durational "effect of disciplinary proceedings on good-time credits is a matter of state law or regulation." *Muhammad*, 540 U.S. at 754 (describing the "mistaken view expressed in Circuit precedent that *Heck* applies categorically to all suits challenging prison disciplinary proceedings").

In *Preiser*, the inmates improperly relied on § 1983 to seek "injunctive relief to compel restoration of the credits, which in each case would result in their immediate release from confinement in prison." *Preiser*, 411 U.S. at 476-77. "Even if the restoration of the [inmates'] credits would not have resulted in their immediate release, but only in shortening the length of their actual confinement in prison, habeas corpus would have been their appropriate remedy." *Id.* at 487. In *Edwards*, the Court found the plaintiff's § 1983 suit not cognizable because the restoration of good-time credits would impact the inmate's release date. *See Edwards*, 520 U.S. at 643, 648.

Unlike the inmates in *Edwards* and *Preiser*, Dillard is serving a life sentence without parole, and restoration of good time credits would have no effect on his life sentence. "In Texas, there are two general ways in which an inmate may become eligible for early release. First, an inmate may become eligible for *parole*; second, he may become eligible for *mandatory supervised*

14

release." *Teague v. Quarterman*, 482 F.3d 769, 774 (5th Cir. 2007) (citing *Madison v. Parker*, 104 F.3d 765, 768 (1997)); *see also* Tex. Gov't Code Ann. § 508.001 (defining mandatory supervision and parole).

Because Dillard's 2006 conviction was for capital murder under Texas Penal Code § 19.03, he is ineligible for mandatory supervision. Tex. Gov't Code Ann. § 508.149(a)(3) ("An inmate may not be released to mandatory supervision if the inmate is serving a sentence for or has been previously convicted of . . . a capital felony under [§] 19.03, Penal Code."); *see also* Act effective June 14, 2001, 77th Leg., R.S., ch. 786, § 3 (Vernon's Texas Session Law Service 2001) (indicating § 508.149(a)(3) was in effect before Dillard's conviction). And because Dillard was sentenced to life without parole, he is also ineligible for parole. Tex. Gov't Code Ann. § 508.145(a) ("An inmate is not eligible for release on parole if the inmate is . . . serving a sentence of life imprisonment without parole."); *see also* Act effective September 1, 2005, 79th Leg., R.S., ch. 787, § 4 (Vernon's Texas Session Law Service 2005) (indicating § 508.145(a) was in effect before Dillard's conviction). "Good conduct time applies only to eligibility for parole or mandatory supervision . . . and does not otherwise affect an inmate's term." Tex. Gov't Code Ann. § 498.003(a) ("Good conduct time is a privilege and not a right."); *see also Yarborough v. Loftis*, No. 6:14-cv-950, 2017 WL 9288033, at *2 (E.D. Tex. Oct. 18, 2017) ("Under Texas law, a loss of good-time credits does not lengthen the duration of a prisoner's sentence or conviction."), *rec. adopted*, 2018 WL 387910 (E.D. Tex. Jan. 12, 2018).

Consequently, restoring Dillard's good-time credits would not invalidate, or imply the invalidity of, his 2006 capital-murder conviction and life-without-parole sentence. Even if the credits were restored, Dillard is ineligible for release from prison, either through mandatory supervision or parole. *See Yarborough*, 2017 WL 9288033, at *3 (concluding *Heck* did not apply

to Texas inmate serving murder sentence because "the disciplinary action that terminated 360 days of [inmate's] good-time credits had no bearing on the length of [inmate's] sentence"). The defendants acknowledge Dillard "is going to be in prison for the rest of his life." ECF No. 124-7 at 9. The *Heck*-bar thus does not apply here, as Dillard's suit arises from his RH confinement conditions, and "requests for relief turning on circumstances of confinement may be presented in a § 1983 action." *Muhammad*, 540 U.S. at 750.

Accordingly, the Court may proceed to its due process analysis. The Court "examine[s] procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (internal citation omitted). Only if the first step is satisfied will the Court consider the second. *Butts*, 877 F.3d at 590.

### 2. Dillard has a clearly established liberty interest in avoiding indefinite RH confinement.

"The types of interests that constitute 'liberty'" under the Fourteenth Amendment "are not unlimited." *Thompson*, 490 U.S. at 460. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citation omitted). In the prison-litigation context, it is "clear that 'indefinite' placement in 'highly restrictive conditions' implicates a liberty interest." *Wilkerson*, 774 F.3d at 858 (citing *Wilkinson*, 545 U.S. at 213, 222-24).

To carry his qualified-immunity burden, Dillard identifies a core of cases, including *Wilkerson*, for the proposition he has a clearly established liberty interest in avoiding indefinite RH confinement. ECF No. 152 at 6-8; ECF No. 168 at 4. The undersigned reviews those cases to

determine whether, by the date of the November 2018 disciplinary hearing, Dillard had a clearly established constitutional liberty interest in avoiding RH. *See Hare*, 135 F.3d at 326; *Harlow*, 457 U.S. at 818.

### a.    The Clearly Established Law

#### i.    *Sandin v. Conner*

In *Sandin*, the Supreme Court recognized prisoners enjoy a liberty interest in "freedom from restraint" that imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 484 (1995). At issue was whether an inmate sentenced to thirty days in "disciplinary segregation" at a disciplinary hearing had a liberty interest in avoiding that segregation sufficient to invoke the Due Process Clause to raise procedural errors that allegedly occurred at the hearing. *See id.* at 475-77. The Court held he did not because the thirty-day segregation sentence was a commonplace confinement condition that did not impact his parole release date and "did not present the type of atypical, significant deprivation" triggering Fourteenth Amendment protection. *Id.* at 486.

#### ii.    *Wilkinson v. Austin*

Ten years later, a unanimous Supreme Court held in *Wilkinson* Ohio inmates enjoyed a liberty interest in avoiding assignment to the Ohio Supermax penitentiary facility ("OSP"), because assignment "impose[d] an atypical and significant hardship under any plausible baseline." *Wilkinson*, 545 U.S. at 223. OSP inmates were confined under the following conditions:

> Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells. Incarceration at OSP is synonymous with extreme isolation. In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates. All

17

> meals are taken alone in the inmate's cell instead of in a common eating area. Opportunities for visitation are rare and in all events are conducted through glass walls. It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.

*Id.* at 214. In addition to the "especially severe limitations on all human contact," the Court considered "two added components" of OSP: (1) placement is "indefinite" and, "after an initial 30–day review, is reviewed just annually"; and (2) "placement disqualifies an otherwise eligible inmate for parole consideration." *Id.* at 224. The Court noted, "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context," such that the plaintiff inmates had "a liberty interest in avoiding assignment to OSP." *Id.*

### iii.    *Wilkerson v. Goodwin*

About nine years later, a unanimous Fifth Circuit panel held that Louisiana inmates placed under closed-cell restriction ("CCR") had a clearly established liberty interest in avoiding CCR's solitary-confinement-like conditions of "23-hour-a-day in-cell confinement, limited physical exercise, limited human contact, and effectively indefinite placement." *Wilkerson*, 774 F.3d at 858.

The Fifth Circuit considered whether the inmates possessed a clearly established liberty interest in avoiding CCR by applying three factors derived from *Sandin* and *Wilkinson*: (1) the confinement's duration, (2) the severity of its restrictions, and (3) whether the confinement was "effectively indefinite." *Id.* at 855-56; *see id.* at 854 ("Following *Sandin* and *Wilkinson*, our sister circuits have considered the severity of the restrictive conditions and their duration as key factors."), 856 ("In *Wilkinson*, the Supreme Court considered the indefinite duration of the confinement at [OSP] to be a significant factor.").

The court found first, the inmate's CCR incarceration was "approaching an extraordinary thirty-nine years." *Id.* at 855. The court cited several cases against which to gauge the durational

factor, signaling a confinement duration exceeding three years in administrative segregation could implicate an inmate's liberty interest, while one less than two-and-a-half years likely would not. *Id.* (citing *Harden-Bey v. Rutter*, 524 F.3d 789, 793 (6th Cir. 2008)).

Second, the court found CCR conditions were substantially similar to OSP's in *Wilkinson*. *Id.* at 855-56. Although "no parole ramifications appear to attach to CCR," in both *Wilkinson* and *Wilkerson* "prisoners are isolated in their cells for 23 hours a day, the exercise allowed in the one hour outside of their cells is limited to isolated areas, there are significant limitations on human contact, and placement is indefinite." *Id.* at 855. Three days per week, CCR inmates received outdoor exercise opportunities, but even these were "alone in a fenced yard, if the weather permit[ted]." *Id.* at 849 (quoting district court's findings). CCR inmates also faced more restrictions relating to educational or religious opportunities than inmates in the general population. *Id.* at 855. Even though CCR inmates received some "contact visits, telephone privileges, peer counseling, and correspondence courses," the above conditions, when considered with the inmate's confinement duration, left "no doubt" the inmate's liberty interest was at stake. *Id.* at 855-56.

Third, the court's just-stated reasoning was "particularly true in light of the district court's factual finding that [the inmate's] solitary confinement" was "effectively indefinite." *Id.* at 856. CCR inmates appeared before a "review board every ninety days." *Id.* at 849. The inmate contended the reviews were a "sham." *Id.* The district court agreed:

> In the present matter, the Review Board's rote repetition of the reason for the inmates['] continued confinement as being the same reason they were initially placed in lockdown effectively eliminates any possibility of release, regardless of their current situation and behavior while in lockdown. The original reason for placement in lockdown can never change; thus plaintiffs' current situation of "indefinite placement" in lockdown is static, with no hope of release other than by death or release from the prison entirely, as was the case for [the inmate here].

*Id.* at 856 (quoting district court's findings). And the Fifth Circuit also agreed, concluding "the summary judgment evidence, viewed in the light most favorable to [the inmate], shows that his solitary confinement [was] effectively indefinite." *Id.*

The inmate thus had a "clearly established liberty interest," precluding summary judgment on qualified immunity grounds. "The Supreme Court's 2005 decision in *Wilkinson* made it clear that 'indefinite' placement in 'highly restrictive conditions' implicates a liberty interest." *Id.* at 858-59 (citing *Wilkinson*, 545 U.S. at 213, 222-24).

### iv.    *Bailey v. Fisher*

In 2016, a different—and still unanimous—Fifth Circuit panel considered an inmate confined under conditions that were "similar in many respects to the conditions in *Wilkinson* and *Wilkerson*." *Bailey v. Fisher*, 647 F. App'x 472, 474 (2016) (unpublished opinion). The court noted "solitary confinement can be used in a way that 'imposes atypical and significant hardship,'" as exemplified by *Wilkinson*. *Id.* It found, "[t]he absence of a negative impact on [the inmate's] possible release date is not fatal" to the liberty-interest analysis, as "the CCR in *Wilkerson* also lacked parole ramifications." *Id.* at 476. Finally, the court restated what *Wilkerson* suggested, that "two and a half years of segregation is a threshold of sorts for atypicality." *Id.* at 476 & n.7 (citing *Wilkerson* and noting "other circuits have seemed to establish shorter thresholds," such as six months, depending on the facts).

### v.    *Blair v. Davis*

Finally, in 2018 this Court applied *Wilkinson* and *Wilkerson* in concluding a TDCJ inmate did not have a liberty interest in avoiding an "extend[ed]" six-to-twelve-month confinement in "General Population Level 5 (G5)." *Blair v. Davis*, No. 5:17-cv-276-M-BQ, 2018 WL 1083620, at *1 (N.D. Tex. Feb. 28, 2018). The inmate's G5 status meant he was "restricted to a cell with no windows and constant fluorescent lighting twenty-four hours per day, and limited to only one hour per week outside." *Id.* at *2. Even so, a six-to-twelve-month confinement duration was "neither lengthy nor indeterminate when compared to the facts of *Wilkerson* or *Wilkinson*." *Id.* The G5 level also was not "the most restrictive environment in the Texas prison system," as "G5 status does not approach the level of restrictions imposed by administrative segregation." *Id.* (*Blair* predates TDCJ changing administrative segregation to RH). For example, G5 offenders enjoyed "two hours each day in the gym or recreation yard" and were "also allowed limited commissary access, *i.e.*, they can spend $25 at the commissary every two weeks." *Id.* Thus, the inmate did not show his extended G5 confinement "constitute[d] an atypical or significant hardship." *Id.*

### b.    Application to Dillard's RH Confinement

Dillard carries his summary judgment burden in showing he has a clearly established liberty interest in avoiding RH confinement. Applying the same three *Wilkerson* factors reveals RH poses an atypical and significant hardship in relation to the ordinary incidents of prison life in Dillard's case. *See Wilkerson*, 774 F.3d at 855-56.

### i.    Duration

Although *Wilkerson* emphasized the CCR inmate's "extraordinary" thirty-nine-year confinement duration, the period of confinement was probative—not dispositive—of the inquiry. *See id.* at 855. It was "clear that 'indefinite' placement in 'highly restrictive conditions' implicates a liberty interest." *Id.* at 858 (citing *Wilkinson*, 545 U.S. at 213, 222-24). In any event, Dillard's

ongoing RH exceeds three-and-a-half years, which surpasses the two-and-a-half-year threshold

noted in *Wilkerson* and *Bailey*. It also is longer than the thirty-day and six-to-twelve-month

durations found insufficient in *Sandin* and *Blair*, respectively. *See also Tate v. Starks*, 444 F. App'x

720, 721 (5th Cir. 2011) (vacating summary judgment against prisoner who sued "prison officials

for placing him in super-maximum security, solitary confinement for *two years* without satisfying

due process requirements") (emphasis added). Dillard satisfies the first factor.

### ii.    Confinement Conditions

Dillard's RH status separates him from the general inmate population and, unlike the G5

inmate in *Blair*, apparently subjects him to TDCJ's most restrictive environment. *See* ECF

No. 124-2 at 20 (indicating "administrative segregation," now called RH, is the most restrictive

custodial classification). RH conditions substantially resemble the solitary-confinement-like

conditions at OSP in *Wilkinson* and CCR in *Wilkerson*. Dillard is confined in an isolation cell for

twenty-two-and-a-half to twenty-four hours per day. ECF No. 86 ¶ 129; *see also* ECF No. 124-4

at 5 ("[A]ll offenders confined in [RH] shall be assigned to single-cell housing."). His isolation

cell is six feet by nine feet (ECF No. 86 ¶ 129), which is smaller than the seven feet by fourteen

feet cell at OSP. Similar to the OSP cells, Dillard's RH cell is "outfitted with a solid steel door"

that has only one "opening controlled by prison guards for purposes of meals and to re[s]train

[inmates] when they exit the cell." *Id.* ¶ 132. There are "no windows to let in fresh air" (*id.* ¶ 136),

a condition not documented at either OSP or CCR.

It thus appears, like in *Wilkinson* and *Wilkerson*, that Dillard's cell is structured to inhibit

contact with other people. Dillard says RH inmates "have no contact with each other." *Id.* ¶ 135.

Even when they "are allowed to leave their cells, they remain isolated from other people." *Id.*

¶ 133. "Recreation is also in an isolated area" (*id.* ¶ 136), similar to the isolated fenced yard at

CCR. *See also* ECF No. 124-2 at 20 ("[RH] offenders leave their cells, for the most part, only for showers and limited recreation."). Dillard's visitation privileges are "strictly no contact" (ECF No. 86 ¶ 130), more restrictive than the contact visits permitted at CCR, and similar to the glass-wall restrictions at OSP. While CCR inmates received telephone privileges, RH inmates "are forbidden access to the Offender Telephone System" except for emergencies. *Id.* ¶ 131. The Supreme Court in *Wilkinson* described the similar "extreme isolation" at OSP as an "especially severe limitation[]." 545 U.S. at 214, 224.

Dillard has roughly one hour per day for recreation. ECF No. 86 ¶ 136. This mirrors OSP and CRC and is less than the two hours permitted the G5 inmate in *Blair*. Twice per week, Dillard may recreate outdoors, which is the only time he receives exposure to fresh air. *Id.* This is less than the three-days-per-week outdoor recreation permitted at CCR, but more than at OSP, where offenders only had indoor recreation. Like at CCR, Dillard has "no access to any privileges or programming" available to the general population, "such as religious gatherings (Hebrew Isrealite) [sic], educational (EH test, further schooling, etc.), vocational programs (cognitive Intervention, BCIS, Intensive Care Treatment, etc.), and entertainment (group recreational activities, audio and visual stimulation, etc.)." *Id.* ¶ 134. And unlike the inmate in *Blair*, there is no indication Dillard receives weekly commissary privileges.

Despite these similarities, there are differences between RH and the restrictive housing in the other cases. For example, unlike at OSP in *Wilkinson*, there is no indication Dillard's cell is constantly illuminated by light. And, unlike in *Sandin* and *Wilkinson*, no parole implications attach to Dillard's RH confinement because of his life-without-parole sentence. Even so, the Fifth Circuit recognized in *Bailey* and *Wilkerson* that the absence of parole implications is not fatal to the analysis. Dillard also identifies RH features that neutralize such distinctions, such as the absence

of windows to let in fresh air. The summary judgment evidence suggests Dillard's RH confinement conditions are sufficiently severe to be actionable under existing Fifth Circuit authority.

### iii.    Effectively Indefinite Confinement

Dillard maintains RH inmates are "held indefinitely," as there is "no set sentencing policy." *Id.* ¶ 128. Dillard acknowledges he receives RH review hearings, but he repeatedly characterizes those hearings as a "sham," "meaningless review," with "stale justification." *See, e.g.*, ECF No. 124-7 at 34-42, 45, 47-49, 54-55. The summary judgment record supports his claims.

Since his RH began, Dillard has had numerous review hearings before TDCJ's State Classification Committee ("SCC") and Restrictive Housing Committee ("RHC"). *See generally* ECF No. 124-7. The record shows the SCC conducted a hearing in October 2018, April 2019, October 2019, April 2020, October 2020, and April 2021. *Id.* at 30-32, 43-44, 55-60; ECF No. 110 at 4-5. Each time, the SCC extended Dillard's RH status roughly 180 days, indicating on a check-the-box form a two-word basis for its decision: "Staff Assaultive." ECF No. 124-7 at 32, 44, 56, 58, 60; ECF No. 110 at 5. For the first five hearings, the SCC provided no additional findings or explanation. ECF No. 124-7 at 32, 44, 56, 58, 60. At the sixth, the SCC noted "10-8-2018 w/inj BFA," apparently referencing Dillard's fight with Omisore, and "LWOP," apparently referencing Dillard's life-without-parole sentence. ECF No. 110 at 5. There is no evidence indicating Dillard received any further SCC hearings. *See id.* at 1-98.

Likewise, the record reflects the RHC conducted a hearing in October 2019, November 2019, December 2019, twice in January 2020, February 2020, March 2020, April 2020, May 2020, twice in June 2020, July 2020, August 2020, September 2020, October 2020, and November 2020. ECF No. 124-7 at 28-29, 35-41, 47-52, 54. The RHC similarly upheld Dillard's RH status, each

time documenting the same two-word justification: "Staff Assaultive." *See id.* The RHC never provided any additional findings or explanation. *Id.*

The RHC also conducted "Special Review" hearings in October 2019, April 2020, and October 2020. *Id.* at 34, 42, 53. It is unclear what purpose these hearings served, but they did not result in any change for Dillard's living conditions, with the RHC each time referencing Dillard's October 2018 fight and similarly not documenting any additional findings or explanation. *See id.*

A reasonable jury could find Dillard's ongoing RH confinement has been, and remains, effectively indefinite. As in *Wilkerson*, the SCC and RHC used "rote repetition" of the October 2018 staff assault as the sole rationale for Dillard's ongoing, continuous RH confinement in 2022. *See Wilkerson*, 774 F.3d at 856. Without any additional rationale or explanation for continued restrictive confinement, Dillard's RH status appears static, as the factual existence of the October 2018 incident, the original justification for his RH confinement, can never change. *See id.* That Dillard has been confined in RH for over three-and-a-half years with such routine reviews confirms his confinement is indefinite.

### iv. Conclusion

The summary judgment record supports a conclusion that Dillard has a clearly established liberty interest in avoiding RH, as evidenced by his confinement's duration, severity, and effectively indefinite nature. Strengthening this conclusion are the absence of any affidavits, declarations, or other evidence cited by the defendants that are probative of the conditions under which Dillard is confined or the circumstances under which he may be released to rebut Dillard's sworn statements proving those facts. *See Hart*, 343 F.3d at 765; *Falcon*, 480 F. App'x at 326.

Indeed, without such evidence from the defendants, the Court is bound to accept Dillard's verified version of the facts as true. *See Tate*, 444 F. App'x at 724-25 (explaining where defendants

"provided no information about the conditions and restrictions" of confinement "or the circumstances under which an inmate may be removed" from such confinement, the "importance of [the inmate's] complaint is clear: it addressed the issues in detail and thus provided significant probative value"); *Hogan v. Epps*, No. 3:07-cv-616-DPJ-JCS, 2009 WL 4785860, at *3 (analyzed with approval by *Tate*, 444 F. App'x at 724-25) (accepting inmate's sworn statements as true in summary judgment analysis), *rec. adopted*, 2009 WL 4785860, at *1 (S.D. Miss. Dec. 8, 2009).

While the defendants proffer TDCJ's Offender Orientation Handbook (ECF No. 124-2), Classification Plan (ECF No. 124-3), and various RH-related administrative directives (*see* ECF No. 124-4), they do not include TDCJ's "Restrictive Housing Plan" ("RHP"), which is the operative policy governing inmates like Dillard who are assigned to RH. *Id.* at 3. Even if they did, the essence of liberty-interest analysis is "not the language of regulations regarding th[e] conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson*, 545 U.S. at 223 (quoting *Sandin*, 515 U.S. at 484). What is important here is evidence of the conditions in which Dillard lives, and only Dillard has offered that evidence.

Because he carried his summary judgment burden, the Court should review whether, in light of his clearly established liberty interest, the defendants' alleged due process violations are "objectively unreasonable." *See Hare*, 135 F.3d at 325.

### 3.    The alleged due process violations are objectively unreasonable.

Having found a clearly established liberty interest, it "does not follow that this type of extended lockdown is necessarily impermissible in every circumstance, but that it is such an 'atypical and significant hardship' that the prison officials must provide adequate procedural protections to the inmate." *Wilkerson*, 774 F.3d at 858-59. Thus, to withstand the defendants' summary judgment motion, Dillard must show the procedures that placed and maintain him in RH indefinitely were unconstitutional. *See Thompson*, 490 U.S. at 460.

When an inmate's liberty interest is at stake during a disciplinary hearing, the inmate should receive: (1) "advance written notice of the claimed violation"; (2) "a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken"; and (3) the opportunity "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *See Wolff*, 418 U.S. at 563-66; *see also Smirl v. Underwood*, No. 3:17-cv-2281-L-BH, 2019 WL 3881553, at *2 (N.D. Tex. June 14, 2019) (stating the *Wolff* protections apply "at a disciplinary hearing that results in a sanction affecting a liberty interest"), *rec. adopted*, 2019 WL 3859657 (N.D. Tex. Aug. 16, 2019). "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff*, 418 U.S. at 558.

### a. Analysis

There is a genuine dispute of material fact concerning the third liberty interest requirement. As mentioned, Dillard has shown he was denied the opportunity to present video evidence in his defense at his second disciplinary hearing. ECF No. 124-7 at 79. It appears undisputed that video evidence of the October 8 fight between Dillard and Omisore exists. *See id.*; ECF No. 124-6 at 5-6 (indicating there is "viewable" video evidence of the fight). Dillard theorizes the video is highly probative because it would have shown him acting in self-defense. He says, "[c]heck the camera the officer came into the dayroom and swung at me and I defended myself." *See id.* at 44; *see also* ECF No. 86 ¶ 62; ECF No. 168 at 23. Additionally, TDCJ investigated Omisore concerning the fight with Dillard, finding Omisore's actions were "Inappropriate" and scheduling him for a disciplinary hearing that would have occurred but-for Omisore's "terminating his employment with the agency." *See* ECF No. 124-6 at 5, 8-10.

Three evidentiary sources offered by the defendants add further support for Dillard's theory. First, an assistant warden who reviewed the video, interviewed witnesses, and concluded that fault rested at least partially with Omisore stated, "[b]ased on the interviews listed above, a review of the documentation to include on-wing video surveillance I found that Officer Omisore's actions did result in him being assaulted by Offender Dillard." *Id.* at 12. The same warden recommended Omisore be disciplined. *Id.* Second, a TDCJ employee suggested in a statement the video shows Omisore provoking Dillard moments before the fight. The employee said, "Officer Omisore is seen on camera continuing to argue with [Dillard] through the dayroom doors." *Id.* at 14. Third, a TDCJ Use of Force Report states the video evidence shows "possible" provocation and "unnecessary use of force," which is "verified via camera." *Id.* at 6.

Yet the hearing officer denied Dillard's request to show the video and overruled his objection to that denial. ECF No. 124-7 at 79. It is unclear why. The hearing record contains a difficult-to-decipher note indicating the video was denied "due to not on Beto Unit," where the fight occurred. *Id.* at 67. The explanation Dillard claims receiving at the time, however, was that the video "was on the Beto 1 Unit." ECF No. 151 at 1-2. A Beto Unit Transfer Case Info Sheet suggests the "video" was "included" with Dillard's case file, which was shipped from the Beto Unit to the Allred Unit (where the hearing occurred) in time for viewing. ECF No. 124-7 at 70.

Regardless, the video's unavailability alone is not a proper justification for its exclusion in a disciplinary hearing when an inmate's liberty interest is at stake. In *Wolff*, the Supreme Court provided three rationales for excluding documentary evidence: "irrelevance, lack of necessity, or the hazards presented in individual cases." *See* 418 U.S. at 566. There is no evidence that allowing Dillard to show the video, either at the November 2018 hearing or any of his subsequent review hearings, would have posed a hazard. Nor is there any inference the video was unnecessary, only

28

that it was unavailable. The video also appears quite relevant, as it may be the evidence most probative of the sequence immediately before the fight and whether Dillard hit Omisore in self-defense. *See id.* (stating "[o]rdinarily, the right to present evidence is basic to a fair hearing"). This is especially so when considering the *only* evidence of guilt documented from the hearing (the "officer's report/charging officer's testimony" (ECF No.124-7 at 67)) apparently derives from one source (defendant McGee) who was not present when the fight began.

Almost forty days lapsed between the October 8 fight and the November 16 hearing. If the video was unavailable, it seems Dillard's hearing date could have been further postponed so the video would be available. Also, more than three-and-a-half years have passed since the November 2018 hearing, during which Dillard has received over twenty review hearings before the SCC and RHC. But it appears that no review committee has watched the video. As Dillard has persuasively argued, "[a]t all of the subsequent S.C.C. hearings, evidence of [his] innocence was ignored or outright refused." ECF No. 24 at 3.

Additionally, the evidence shows Dillard also was denied the opportunity to call witnesses to testify on his behalf. ECF No. 124-7 at 79; ECF No. 168 at 23. It appears undisputed there were witnesses who would have testified on Dillard's behalf. Attached to the defendants' motion are three inmate-witness statements probative of Dillard's self-defense theory, including the following:

> Offender was told to go in dayroom. Offender went into dayroom. The officer told offender he would come in the dayroom and beat his ass. Officer entered dayroom and offender swung on him.

> The officer kept opening the dayroom door picking at the offender.

> I s[aw] the guard messing with the inmate. The inmate went in the dayroom. Then the guard opened the door & got [in] his face. This happened 3 times the 3rd time they started to fight. That was all I s[aw].

ECF No. 124-6 at 29-31. In the prison disciplinary hearing context, there are conceivably more reasons to deny an inmate the right to call witnesses. Here, it may be the inmate-witnesses were not on the Allred Unit where the hearing occurred, or perhaps allowing Dillard to call witnesses raised safety concerns. *See Wolff*, 418 U.S. at 566 (stating that prison officials "must have the necessary discretion" to "refuse to call witnesses that may create a risk of reprisal or undermine authority"). But unlike with the video evidence, the defendants have offered no explanation for why Dillard was not allowed to call witnesses in his defense. ECF No. 124-7 at 67, 79; *see Wolff*, 418 U.S. at 566 ("Although we do not prescribe it, it would be useful . . . to state [a] reason for refusing to call a witness.").

Dillard also challenges whether the hearing satisfied the first and second due-process requirements, *see id.* at 563-65, asserting he did not receive "24-hour notice" of the hearing or an "adequate written disposition/hearing record." ECF No. 168 at 23. Dillard, to some extent, contradicts his assertions. *See* ECF No. 86 ¶¶ 50 (acknowledging he was "served with disciplinary charges for assaulting staff" on "October 31, 2018," more than two weeks before the hearing), 68 (acknowledging receipt of hearing record documenting "Offense Report/Charging Officer's testimony" as the evidence of his guilt). The defendants have not denied Dillard's allegations or offered summary judgment evidence in opposition to them.

### b.    Conclusion

A reasonable jury could find it objectively unreasonable that Dillard was denied his due process right to call witnesses and present documentary evidence at the November 16 disciplinary hearing. It does *not* necessarily follow that the evidence of Dillard's guilt is insufficient, just that the procedures used in finding him guilty may have been. Dillard's right to due process is "absolute," *Carey v. Piphus*, 435 U.S. 247, 266 (1978) (recognizing "the importance to organized

society that procedural due process be observed"), and the denials here evidence procedural violations the Fourteenth Amendment of the Constitution serves to protect. *See Wolff*, 418 U.S. at 558.

### 4.    Theories of Liability

#### a.    Bryan Reitsma

Dillard seeks judgment against Reitsma in his individual capacity for his conduct presiding over the November 16, 2018 disciplinary hearing. *See* ECF No. 86 ¶¶ 142, 144-45, 147-49. There is an affirmative link between Reitsma and Dillard's constitutional injury because Reitsma, as the presiding officer, denied Dillard the right to call witnesses and present video evidence. *See* ECF No. 124-7 at 67, 79.

A reasonable jury could find Reitsma liable because he knew or was on notice in November 2018 that Dillard's liberty interest entitled him to procedural protections. *See Wilkerson*, 774 F.3d at 858 (examining whether "a reasonable prison official would have been on notice that continuing [the inmate's] solitary confinement would give rise to a liberty interest requiring procedural protections"); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (stating qualified immunity does not protect "those who knowingly violate the law"). Accordingly, summary judgment is improper as to Reitsma.

#### b.    Lorie Davis, Jimmy Smith, Elbert Holmes, Andrea Lozada, and Timothy Washington

Dillard sues these persons in their individual capacities for (1) failing to address the due process violations arising from the November 16, 2018 disciplinary hearing and Dillard's review hearings and (2) implementing the RHP that Dillard submits is unconstitutional under the void-for-vagueness doctrine. ECF No. 86 ¶¶ 142, 144-47, 149, 155-58. Unlike Reitsma, these five

defendants apparently were not present during any of Dillard's hearings, so Dillard's claims against them implicate § 1983's general bar to supervisory liability.

### i.    Supervisor Liability: Affirmative Participation

Dillard alleges there is a fact issue concerning these defendants' affirmative participation in the due process violations. He declares he "wrote to and appealed to defendant[]s Davis, Smith, Holmes and Lozada on several occasions stressing the due process violations suffered at [the] disciplinary proceeding." ECF No. 86 ¶ 73; *see also id.* ¶ 105 ("Davis, Smith, Holmes and Lozada learned of the due process violations . . . through [Dillard's] extensive grievance filing, letters to them, oral complaints and [this] civil action."). Dillard also personally "spoke with defendant Washington about the current conditions of confinement" and this lawsuit. *Id.* ¶ 84.

Despite Dillard's communications with them and their positions of authority within the TDCJ, these defendants allegedly have done nothing to address the violations, allowing Dillard to remain in RH indefinitely without due process of law. *Id.* ¶¶ 144-45, 149; *see also id.* ¶ 101 ("Davis, Smith, Holmes, Lozada, and Washington made a conscious decision to allow [Dillard] to be held in [RH] without the mandatory notice, hearing and procedural due process."). The defendants have not filed or cited any declaration, affidavit, or other evidence denying receipt of Dillard's communications, being aware of his complaints, or having the authority to address the due-process violations. *See* ECF No. 124; Fed. R. Civ. P. 56(c)(1)(A) (requiring movant to cite to the record); *see also Scribner v. Linthicum*, 232 F. App'x 395, 396 (5th Cir. 2007) (denying qualified immunity to supervisory defendant where inmate "averred in his complaint under penalty of perjury that he wrote to the defendant about his problems" and "the defendant ha[d] not denied receiving" the correspondence). Dillard's sworn declarations of the matter are thus unrebutted. *See Hart*, 343 F.3d at 765; *Falcon*, 480 F. App'x at 326.

A reasonable jury could find these defendants affirmatively participated in the due process violations through their deliberate indifference to the actions of Reitsma, the SCC, or the RHC. *See Porter*, 659 F.3d at 446 (alterations in original) (due process violation at issue) ("In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates."); *see also Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017) (stating "[s]upervisory officials are accountable for their own acts of deliberate indifference"). Moreover, the record leaves open the possibility that these defendants directed Reitsma, the SCC, or RHC to commit the due process violations at issue. *See also Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (stating a supervisor may be liable under § 1983 if there is "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation"). Summary judgment is improper for these defendants.

### ii.    Supervisor Liability: Unconstitutional Policy Implementation

Dillard claims Davis, Smith, Holmes, and Lozada (but not Washington) promulgated and enforced the RHP. ECF No. 86 ¶ 97. He claims the RHP is facially void for vagueness because "it does not give an offender adequate notice of the prohibited conduct" triggering RH confinement and because RHP facilitates review hearings that rely on "stale justifications," like the October 2018 fight, to serve as the sole basis justifying Dillard's ongoing confinement, "no matter [his] rehabilitation efforts." *Id.* ¶¶ 109, 112-13. He also claims RHP is void for vagueness as applied to him because it resulted in denial of his rights to show video evidence and call witnesses. *Id.* ¶ 110.

An inmate may challenge a prison policy under the void-for-vagueness doctrine. *See, e.g.*, *Walker v. Savers*, 658 F. App'x 720, 729-31 (5th Cir. 2016). As mentioned, the defendants have

not proffered a copy of the RHP for the Court's inspection, nor have they filed any evidence of the procedural circumstances under which Dillard was and remains confined in RH. It is thus unclear whether Dillard's alleged due process violations flow from unconstitutional policies the defendants promulgated or enforced. Consequently, defendants Davis, Smith, Holmes, and Lozada are not entitled to summary judgment on this theory of liability.

> **c.    Bobby Lumpkin, Jimmy Smith, Michael Feazell, and Timothy Hooper**

Dillard seeks prospective relief from these defendants in their official capacities under the *Ex Parte Young* doctrine. *See* ECF No. 86 ¶¶ 9-12; *Valentine*, 993 F.3d at 280; *see also Chrissy F. by Medley v. Miss. Dep't of Pub. Welfare*, 925 F.2d 844, 849 (5th Cir. 1991) ("Neither absolute nor qualified personal immunity extends to suits for injunctive or declaratory relief under § 1983."). The proper defendant for such a claim is the "state official acting in violation of federal law" who has "a sufficient connection to enforcing the allegedly unconstitutional law." *Hope*, 861 F. App'x at 578 (recognizing most institutional litigation that involves state prisons is brought under the *Ex Parte Young* doctrine).

Only Lumpkin, the current CID Director, appears sufficiently connected to enforcing the rules or procedures relating to Dillard's still-ongoing due process violations. *See* ECF No. 86 ¶ 9. Although the summary judgment motion does not specify Lumpkin's enforcement authority (*see* ECF No. 124), it appears Lumpkin oversees TDCJ disciplinary rules and procedures. *See* ECF No. 124-2 at 7, 85-87 (explaining general disciplinary rules, which are "adopted by the Director of the [TDCJ CID]"); *see also Correctional Institutions Division*, TEX. DEP'T OF CRIM. JUST., https://www.tdcj.texas.gov/divisions/cid/index.html (last visited June 17, 2022) (indicating Lumpkin, as the CID Director, is "responsible for support functions such as . . . [the] Office for Disciplinary Coordination"). Under *Ex Parte Young*, Dillard may seek "prospective injunctive

relief to prevent a continuing violation of federal law," with the violation here being Dillard's ongoing RH confinement without due process. *See Green v. Mansour*, 474 U.S. 64, 68 (1985). The Court should deny summary judgment as to Lumpkin.

By contrast, Smith, Feazell, and Hooper are wardens at the Allred Unit (ECF No. 86 ¶¶ 10-12), and Dillard has since informed the Court he is now confined in RH at TDCJ's Michael Unit. ECF No. 175; *see also* ECF No. 211 at 4. There is no indication Allred officials have enforcement authority extending to procedures or inmates at the Michael Unit. Thus, Smith, Feazell, and Hooper are improper defendants in their official capacities, and Dillard's corresponding claims against them for prospective injunctive relief should be dismissed. Because Dillard sues Feazell and Hooper in their official capacities only, the Court should dismiss them from this case with prejudice.

### 5.    Fourteenth Amendment: Conclusion

The Court should deny summary judgment as to Reitsma, Davis, Smith (in his individual capacity only), Holmes, Lozada, and Washington, because Dillard raises genuine disputes of material fact about whether their actions were objectively unreasonable in placing him in RH for an effectively indefinite period without due process of law. *See Brown*, 623 F.3d at 253. The Court similarly should deny summary judgment as to Lumpkin on Dillard's claim for prospective injunctive relief, but the Court should grant summary judgment to Feazell, Hooper, and Smith (in his official capacity only) on this claim.

The Court also should deny Dillard's Motion for Partial Summary Judgment, which seeks judgment on these due process issues only. The Court owes state prison officials considerable deference. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant

responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."). And here, the Court would benefit from receiving trial testimony or documentary evidence more probative of the specific circumstances surrounding Dillard's initial and ongoing RH confinement.

### B.    First Amendment: Retaliation

Dillard asserts retaliation claims against Shon McGee, Cody Miller, James Bullard, Jayton Chavers, Dakota Denney, Gregory Fredricks, and Timothy Washington. ECF No. 86 ¶¶ 91, 141, 150, 152. For qualified immunity purposes, "[t]he law of this circuit is clearly established . . . that a prison official may not retaliate against or harass an inmate . . . for complaining to a supervisor about a guard's misconduct." *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995). A retaliation claim has four elements: "(1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999).

For the first element, "[f]iling grievances and otherwise complaining about the conduct of correctional officers through proper channels are constitutionally protected activities." *Reese v. Skinner*, 322 F. App'x 381, 383 (5th Cir. 2009). For the second, the inmate "must produce direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'" *Woods*, 60 F.3d at 1166 (quoting *Cain v. Lane*, 857 F.2d 1139, 1143 n.6 (1988)). Third, "[t]he retaliatory adverse act must be more than de minimis to state a viable retaliation claim; the act must be 'capable of deterring a person of ordinary firmness from further exercising his constitutional rights.'" *Butts*, 877 F.3d at 588-89 (quoting *Morris v. Powell*, 449 F.3d 682, 686 (2006)). Fourth, the inmate must "establish that but for the retaliatory motive . . . the complained of incident would not have occurred." *Woods*, 60 F.3d at 1166; *see also Walker v.*

36

*Savers*, 658 F. App'x 720, 729 (5th Cir. 2016) (explaining "an official's otherwise legitimate act" can "be retaliation if the motive is not legitimate").

The undersigned addresses the claims against each of these defendants separately, but includes Bullard, Chavers, Denney, and Fredricks in one heading because the evidence against them overlaps. As noted, no defendant has offered an affidavit, declaration, or other evidence contradicting Dillard's assertions (*see* ECF No. 124), leaving Dillard's sworn declaration of the facts unrebutted. *See Hart*, 343 F.3d at 765; *Falcon*, 480 F. App'x at 326.

### 1.    Shon McGee

McGee responded to the Dillard-Omisore fight, filed an Offense Report charging Dillard with assault, and was the sole witness at the November 16 disciplinary hearing. *See* ECF No. 124-7 at 67-68. McGee's Offense Report and testimony were the only evidence cited in Dillard's finding of guilt. *See id.* Dillard claims McGee testified falsely and "knowingly" filed a "false incident report" in retaliation of prior events. ECF No. 86 ¶¶ 82, 141.

Dillard's history with McGee dates back to September 2017, about a year before the fight. McGee "had been targeting [Dillard] with strip searches and making inappropriate jokes about the size of [Dillard's] genitals." *Id.* ¶ 30. Once "while Dillard stood in the . . . hallway naked," McGee mocked his body weight and genitals. *Id.* ¶ 31. Dillard complained to a TDCJ official about McGee's comments. *Id.* ¶ 30. Two days later, "McGee wrote a false misconduct report on Dillard for threatening to inflict harm on him." *Id.* ¶ 32. After related disciplinary proceedings were dismissed, McGee confronted Dillard and "threatened to get [him] G5'd," referring to Dillard's custody status. *Id.* ¶ 33.

After the October 2018 fight, Dillard claims McGee falsely and purposefully charged him with assaulting Omisore and filed the Offense Report despite having "no direct knowledge of the

incident." *Id.* ¶¶ 34, 66. As Dillard observes, "McGee's initial incident report states that he had responded to a staff assault—not witnessed it." *Id.* ¶ 35; *see also* ECF No. 124-7 at 68 (McGee's "Offense Report"). McGee acknowledges the fight occurred on the Unit's "P Wing" and that he had "left the wing front and went to T and U corridor" before the fight. ECF No. 124-6 at 17. Dillard theorizes the "filing of the false incident report effectively fulfilled defendant McGee's [September 2017] threat to get [Dillard] negatively classified and off of the Beto 1 unit." ECF No. 86 ¶ 66; *see also Hart*, 343 F.3d at 764 (filing a disciplinary report was more than *de minimis* because of the punishment that resulted to the inmate).

A reasonable jury could find: (1) Dillard exercised his First Amendment Right to complain about McGee's strip searches and harassment; (2) McGee intended to retaliate against Dillard because of the complaint; (3) McGee filed the Offense Report and testified against Dillard, hoping Dillard would be moved to RH; and (4) but-for Dillard's complaining, McGee would not have filed the Offense Report or testified as he did. *See Woods*, 60 F.3d at 1165 (noting the "concern is whether there was retaliation for the exercise of a constitutional right, separate and apart from the apparent validity of the underlying disciplinary report"). The Court should deny McGee summary judgment on this claim.

### 2. Cody Miller

Cody Miller presided over Dillard's first disciplinary hearing on November 6, 2018. ECF No. 86 ¶ 51. Dillard describes a tense exchange when Miller pressed him to show any exculpatory evidence he had, including the identity of Omisore's assailant (if not Dillard). *See id.* ¶ 52. "Without turning on the recorder Miller asked [Dillard] questions about the case and became verbally combative when [Dillard] could not identif[y] the [assailant]." ECF No. 168 at 22. Dillard declined to offer any evidence "without the benefit of the hearing record being turned on." ECF

No. 86 ¶ 52. Miller "threatened" Dillard (*id.*), saying, "If you tell me who it was this can all go away," but "if you don't I will run this case without you and max you out, it's up to you how hard your time on [the] Allred [Unit] will be." ECF No. 15 at 1.

As mentioned, the first hearing was dismissed without any apparent consequence to Dillard. ECF No. 86 ¶ 35. Afterward, Dillard told Miller he "would be filing a step 1 grievance about [Miller's] verbal abuse, threats and failure to follow disciplinary procedures." ECF No. 15 at 1. Miller "threaten[ed] to re-initiate the case and to make [Dillard's] time on [the] Allred Unit hard." ECF No. 86 ¶ 53. The next day, Dillard "filed an administrative grievance outlining defendant Miller's threats and unprofessionalism during [the] disciplinary proceeding." *Id.* ¶ 54.

A week later, Miller restarted disciplinary proceedings (*id.* ¶ 55), "ma[king] good on his promise to re-initiate the disciplinary" concerning "the same charges." ECF No. 168 at 22; *see also Butts*, 877 F.3d at 589 (finding cognizable claim where defendant's alleged retaliation occurred after defendant learned that plaintiff "intended to file an administrative grievance against [defendant]").

The next day, Dillard's second hearing took place. ECF No. 86 ¶ 58. Miller did not preside, but he allegedly manipulated the proceeding by instructing the new presiding officer, Bryan Reitsma, to exclude exculpatory evidence that had surfaced at the first hearing. ECF No. 168 at 22; ECF No. 15 at 2. Reitsma found Dillard guilty, leading to Dillard's ongoing RH confinement.

In RH, "[v]arious correctional officers, including defendant[]s Bullard, Chavers, Denney and Fredricks began depriving [Dillard] showers, meals, and exercise (recreation)." ECF No. 86 ¶ 75; *see Bibbs v. Early*, 541 F.3d 267, 272 (5th Cir. 2008) (subjecting an inmate to harsh confinement conditions is a "measure of retaliation"). Bullard, Chavers, Denney, and Fredricks often invoked Miller's name (ECF No. 168 at 22) with taunts like "Captain Miller says welcome

to Allred SNITCH" (ECF No. 15 at 2), "Merry Christmas snitch" (ECF No. 168 at 22), or "Captain Miller says Hi." ECF No. 86 ¶ 77.

A reasonable jury could find: (1) Dillard exercised his First Amendment Right to file a grievance about Miller's conduct at the first disciplinary hearing; (2) Miller intended to retaliate against Dillard because the alleged retaliatory acts occurred after Dillard filed his grievance; (3) in retaliation for Dillard's grievance filing, Miller reinitiated disciplinary proceedings against Dillard and directed TDCJ officers to deprive Dillard of meals, recreation, and showers; and (4) but-for Dillard's grievance filing, Miller would not have retaliated. The Court should deny Miller summary judgment on this claim.

### 3. James Bullard, Jayton Chavers, Dakota Denney, and Gregory Fredricks

As mentioned, Dillard asserts Bullard, Chavers, Denney, and Fredricks began depriving him of showers, meals, and exercise after he complained of Miller. *See* ECF No. 86 ¶¶ 74-75. Dillard filed separate grievances about their conduct. *See* ECF No. 15 at 3-5; ECF No. 20 at 1. But their deprivations continued and "lasted well into 2021." ECF No. 168 at 22. These four defendants allegedly withheld lunch and dinner from Dillard for one-to-seven-day consecutive periods. *See, e.g.*, ECF No. 13 at 1-2; ECF No. 21 at 2-3, 5; ECF No. 86 ¶ 75. Dillard often had to "wait 24-hours until [his] next meal." ECF No. 21 at 2. Dillard, who once weighed 347 pounds (*id.*), lost over 130 pounds. ECF No. 86 ¶ 75. He now weighs about 215 pounds. ECF No. 168 at 23; *see also* ECF No. 13 at 3 (Dillard: "I have watched myself physically waste away . . . ."). Chavers once "came to [Dillard's] door and said, 'You are not such a big boy anymore, huh, snitch!' [and then Chavers] walked away laughing." ECF No. 21 at 2; *see also* ECF No. 44 at 3 (Bullard cursed him by saying, "YOU f***ing snitch.'").

Similarly, Dillard asserts the defendants withheld shower and recreational privileges. They once denied him showers for fourteen consecutive days. ECF No. 13 at 2. They also once denied him exercise opportunities for twenty-three consecutive days, and once for sixty-eight out of eighty-one days total. ECF Nos. 86 ¶ 75, 13 at 2. When Dillard does not shower or exercise, he has "absolute cell confinement," often combined with the meal deprivations. *See* ECF No. 21 at 5.

A reasonable jury could find: (1) Dillard exercised his First Amendment Right to file grievances about Miller, Bullard, Chavers, Denney, and Fredricks; (2) Bullard, Chavers, Denney, and Fredricks intended to retaliate against Dillard because their alleged retaliatory acts began after Dillard filed his grievance against Miller and continued after Dillard began filing grievances against them; (3) in retaliation of Dillard's grievances, the defendants deprived Dillard of meals, recreation, and shower opportunities; and (4) but-for Dillard's grievances, the defendants would not have done so. Summary judgment is thus improper on Dillard's First Amendment claims against them. Dillard also asserts related Eighth Amendment claims against these defendants, which the undersigned addresses below.

### 4.    Timothy Washington

In October 2019 Dillard encountered Washington and complained about his confinement conditions. ECF No. 86 ¶ 84; *see also* ECF No. 13 at 3. Dillard also informed Washington that Dillard was suing him in this § 1983 suit. ECF No. 86 ¶ 84. Washington responded, "Get out of my face. I know all about you!" *Id.* A few days later, Washington for no apparent reason "exclude[ed Dillard] from the informal policy of giving offenders two (2) line classes for going a complete year case free." *Id.* ¶ 91; *see Dillard*, 2022 WL 329984, at *6 (analyzing this same claim as to Washington).

A reasonable jury could find: (1) Dillard exercised his First Amendment Right to complain about his confinement conditions by complaining directly to Washington and by suing Washington in this lawsuit; (2) Washington's verbal response suggests an intent to retaliate; (3) Washington later withheld from Dillard certain line class privileges to which Dillard was otherwise entitled; and (4) but-for Dillard's filing this lawsuit, Washington would not have withheld those privileges. The Court should deny Washington summary judgment on this claim.

### 5.    First Amendment: Conclusion

The Court should deny summary judgment on all of Dillard's First Amendment retaliation claims. If Dillard prevails at trial, then defendants Davis, Smith, Holmes, Lozada, and Washington also could be liable to the extent they were aware of others' retaliatory acts and did nothing to address them. *See* ECF No. 86 ¶¶ 78, 153, 158; *Porter*, 659 F.3d at 446. And to the extent the retaliatory acts remain ongoing, then Dillard may seek prospective injunctive relief from the defendants whom he sues in their official capacities. As discussed above, the only such proper defendant here is Lumpkin, who should remain a party for purposes of Dillard's First Amendment claim too.

### C.    Eighth Amendment: Conditions of Confinement

Dillard asserts conditions-of-confinement claims against James Bullard, Jayton Chavers, Dakota Denney, Gregory Fredricks, Lorie Davis, Jimmy Smith, Elbert Holmes, Andrea Lozada, Timothy Washington, Bobby Lumpkin, Michael Feazell, and Timothy Hooper. *See* ECF No. 86 ¶¶ 146-47, 152-54, 156, 158. For qualified immunity purposes, there is a "clearly established constitutional right" under the Eighth Amendment "to be free from conditions of confinement which pose an unreasonable risk of damage to a prisoner's health." *Burleson v. Tex. Dep't of Crim. Just.*, 277 F.3d 1374, 2001 WL 1485841, at *2 (5th Cir. Nov. 14, 2001) (unpublished op.). "Like

other Eighth Amendment claims, a conditions-of-confinement claim must satisfy tests for both objective and subjective components." *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998).

"First, there is an objective requirement that the condition 'must be so serious as to "deprive prisoners of the minimal civilized measure of life's necessities," as when it denies the prisoner some basic human need.'" *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) (quoting *Harris v. Angelina Cnty., Tex.*, 31 F.3d 331, 334 (5th Cir. 1994)). "Second, under a subjective standard, the prisoner must establish that the responsible prison officials acted with deliberate indifference to his conditions of confinement." *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999). Deliberate indifference means "the defendant: (1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (alterations in original) (quoting *Farmer*, 511 U.S. at 837).

The undersigned addresses Dillard's claims under both Eighth Amendment components with attention to the defendants' assertion of qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (stating the Court may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand"). Again, no defendant has offered any affidavit, declaration, or other evidence contradicting Dillard's assertions (*see* ECF No. 124), leaving Dillard's sworn declaration of the facts unrebutted. *See Hart*, 343 F.3d at 765; *Falcon*, 480 F. App'x at 326.

### 1.    Eighth Amendment: Objective Component

Dillard challenges the following conditions of his RH confinement: (a) meal deprivations; (b) exercise/recreation deprivations; (c) shower deprivations; (d) prolonged solitary-like confinement; and (e) inadequate medical care relating to COVID-19.

43

### a.      Meal Deprivations

It is clearly established "that state prisoners are entitled to reasonably adequate food." *Cooper v. Sheriff, Lubbock Cnty., Tex.*, 929 F.2d 1078, 1081, 1083-84 (5th Cir. 1991) (reasoning prisoner has cognizable claim where he alleged being "continuously deprived of food" for twelve "consecutive" days resulting in "substantial weight loss"). "The Eighth Amendment requires that inmates be provided 'well-balanced meal[s], containing sufficient nutritional value to preserve health.'" *Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (alteration in original) (quoting *Green v. Ferrell*, 801 F.2d 765, 770 (5th Cir.1986)). "The state is not required, however, to provide three meals a day." *Sowell v. Kyle*, No. 2:08-cv-0051, 2011 WL 320196, at *11 (N.D. Tex. Jan. 13, 2011), *rec. adopted*, 2011 WL 338863 (N.D. Tex. Feb. 2, 2011). Whether meal deprivations are unconstitutional "depends on the amount and duration of the deprivation." *Talib v. Gilley*, 138 F.3d 211, 214 n.3 (5th Cir. 1998) (determining prisoner did not have cognizable claim where he allegedly "missed about fifty meals in five months and lost about fifteen pounds").

Dillard has offered uncontradicted summary judgment evidence that Bullard, Chavers, Denney, and Fredricks often deprived him of meals. Similar to *Cooper* and worse than in *Talib*, Dillard declares the defendants' meal deprivations resulted in him losing over 130 pounds. *See* ECF No. 86 ¶ 75; *Mejia v. Ramirez*, No. 2:14-cv-238, 2016 WL 11473812, at *6 (S.D. Tex. Feb. 11, 2016) ("Weight loss may be evidence that a prisoner received constitutionally inadequate food."), *rec. adopted*, 2016 WL 3661902 (S.D. Tex. July 11, 2016).

But Dillard's weight loss appears to some extent to be self-inflicted, as he once went on hunger strike to protest RH. He stated, "I have denied 22 consecutive meals so far in oneness with the other [RH] offenders peacefully protesting the conditions of confinement in Allred's [RH]." ECF No. 212 at 16. And unlike in *Cooper*, there also is no evidence the defendants ever completely

deprived Dillard of food for twelve or more consecutive days. The evidence discussed and cited above instead reflects lunch and dinner only were withheld, while Dillard still received breakfast, for seven-day periods at most. Whether the defendants' meal deprivations establish an Eight Amendment violation under its objective prong thus turns on the caloric content and overall nutritional value of those breakfast meals. *See Berry*, 192 F.3d at 507.

In a similar case involving "the forced deprivation of two of the regular three jail meals served each day," the Sixth Circuit determined the burden of proof rested with the defendants "as to the adequacy of the one meal actually furnished to maintain normal health" because "such knowledge is peculiarly within their possession." *Cunningham v. Jones*, 567 F.2d 653, 660 (6th Cir. 1977). "The prisoners, of course, could have no access to proofs as to calorie count in the meals actually furnished." *Id.* The defendants here have not discussed the nutritional value or caloric content of the breakfasts they provided Dillard during the periods where he apparently was deprived of lunch and dinner. Consequently, there remains a fact issue whether the meal deprivations constituted a sufficiently serious deprivation under clearly established Eighth Amendment law. Summary judgment is improper on this point.

### b.    Exercise/Recreation

It is similarly established that "inmates confined in small quarters during the majority of their extended sentences enjoy a right to adequate exercise and recreation." *Maze v. Hargett*, 200 F.3d 814, 1999 WL 1093469, at *5 (5th Cir. Oct. 27, 1999) (concluding defendants were not entitled to qualified immunity). Exercise is an "identifiable human need," *Wilson v. Seiter*, 501 U.S. 294, 304 (1991), which serves physical and psychological health. *Maze*, 1999 WL 1093469, at *5. Exercise deprivation claims "should be evaluated on a case-by-case basis using, inter alia, the following criteria: (1) the size of the inmate's cell; (2) the amount of time the inmate spends

locked in his cell each day; and (3) the overall duration of the inmate's confinement." *Hewitt v. Henderson*, 271 F. App'x 426, 428 (5th Cir. 2008); *Miller v. Carson*, 563 F.2d 741, 751 n.12 (5th Cir. 1977) (noting "deprivation of exercise per se does not violate the cruel and unusual punishment clause").

Dillard is confined in a windowless, six feet by nine feet cell for twenty-two-and a-half to twenty-four hours per day. ECF No. 86 ¶ 129. He has been in RH for over three and a half years under an apparently indefinite sentence. *See id.* ¶ 107; ECF No. 211 at 4. Generally, RH inmates should receive one hour per day for recreation outside their cells, with outdoor recreation twice per week to receive exposure to fresh air. ECF No. 86 ¶ 136; *see also Wilson*, 501 U.S. at 304-05 (citing with approval *Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979) that "outdoor exercise required when prisoners otherwise confined in small cells almost 24 hours per day"). But the summary judgment evidence shows the defendants have repeatedly deprived Dillard of these exercise opportunities, once for sixty-eight out of eighty-one days (ECF No. 13 at 2), and once for twenty-three consecutive days. ECF No. 86 ¶ 75. It is unclear whether in-cell exercise is practicable for Dillard. *See Hewitt*, 271 F. App'x at 428.

In *Mejia*, the Southern District of Texas partially declined to enter summary judgment against a prisoner who, in addition to being denied meals, "was denied recreation for periods of up to 37 days consecutively on more than one occasion and 235 days out of 365." 2016 WL 11473812, at *9. The plaintiff "complain[ed] that, due to lack of exercise and the other conditions [including meal deprivations], he lost 25 pounds, he began having high blood pressure, and suffered related psychological difficulties that led to depression, self-harm and suicide attempts." *Id.* at *8. The medical records supported that "the lack of regular exercise caused a rise in his blood pressure." *Id.* at *10. There were thus "questions of material fact" concerning "the harm and risk of harm to

46

Plaintiff as a result of the deprivation of calorically sufficient food, sufficient exercise, and sufficient time out of his cell to preserve his health." *Id.*

Similarly, there are fact questions here regarding Dillard's lack of exercise opportunities. As in *Mejia*, Dillard contends the exercise deprivations contributed to his 130-pound weight loss. ECF No. 86 ¶ 154. And although the defendants indicate Dillard's medical records are filed under seal (*see* ECF No. 124 at 10, citing Ex. E), those records only relate to COVID-19 testing. *See* ECF Nos. 125-1 (filed under seal). Dillard's complete medical records are peculiarly in the defendants' possession, and those records could indicate additional relevant injuries like the records did in *Mejia*. Indeed, Dillard has asserted he has underlying medical conditions, including a semi-functional heart and hypertension, which may be affected by insufficient exercise. *See, e.g.*, ECF No. 21 at 4; ECF No. 168 at 23 (Dillard listing his "underlying medical problems"). Summary judgment is similarly improper on this point because it is unclear how much exercise Dillard received and how that amount affected his physical condition, weight loss, and medical conditions.

### c.    Showers

 "The Eighth Amendment does not require that inmates receive frequent showers." *Mejia*, 2016 WL 11473812, at *7 n.5. Dillard says the longest period he was deprived of showers was fourteen days and that he was once denied showers for forty-two out of ninety days. ECF No. 13 at 2. Being denied showers fourteen consecutive days, without more, does not trigger an Eighth Amendment violation. *See Allen v. Barton*, No. cv-20-890-JWD-EWD, 2021 WL 6776873, at *3 (M.D. La. Dec. 30, 2021) (stating although plaintiff "was unable to shower for fourteen days, which may have been unpleasant, this experience does not rise to the level of a constitutional violation"), *rec. adopted*, 2022 WL 323963 (M.D. La. Feb. 2, 2022). Moreover, unlike with the meal and exercise deprivations and their attendant weight loss, there is no indication how the

shower deprivations contributed to any form of harm to Dillard, including his weight loss. *See Mejia*, 2016 WL 11473812, at *8 (discussing fact issue relating to "harm from the lack of showers in the form of skin rashes"). While the evidence of shower deprivations, combined with the other deprivations, remains competent to support Dillard's First Amendment retaliation claims, this evidence alone is insufficient to implicate the Eighth Amendment, much less clearly established Eighth Amendment law. Summary judgment is proper on this point.

### d.    Prolonged, solitary-like confinement

It is not clearly established that solitary confinement violates the Eighth Amendment. *Novak v. Beto*, 453 F.2d 661, 665 (5th Cir. 1971) ("We begin by turning to the long line of cases, to which we have found no exception, holding that solitary confinement *per se* is not 'cruel and unusual.'"). Dillard submits "[*p*]*rolonged* solitary confinement [in RH] violates Eighth Amendment prohibitions against cruel and unusual punishment." ECF No. 86 ¶ 128 (emphasis added). But prolonged solitary confinement is not a clearly established Eighth Amendment violation. *Hope*, 861 F. App'x at 582 (citing *Hutto v. Finney*, 437 U.S. 678, 686 (1978)) (stating "long-term solitary confinement is not per se cruel and unusual"); *Hutto*, 437 U.S. at 686 ("It is perfectly obvious that every decision to remove a particular inmate from the general prison population for an indeterminate period could not be characterized as cruel and unusual").

Only where the solitary-confinement conditions are "base, inhuman, and barbaric" do they satisfy the Eighth Amendment's objective component. *See Novak*, 453 F.2d at 665. A "common thread" in cases involving such conditions "is the deprivation of basic elements of hygiene." *Id.*; *e.g.*, *Hope*, 861 F. App'x at 584 ("[Inmate's] decades of solitary confinement alongside such conditions of mold, urine, and feces have caused the physical and psychological deterioration he alleges, and it is clear that such an allegation is sufficiently serious to invoke Eighth Amendment

concerns."); *Foulds v. Corley*, 833 F.2d 52, 54 (5th Cir. 1987) (reasoning where inmate alleged "that his solitary confinement cell was extremely cold and that [inmate] was forced to sleep on the floor where rats crawled over him," that "[i]f proven, such conditions of confinement would contravene the eighth amendment").

Dillard claims RH conditions are "indistinguishable" from solitary confinement. ECF No. 86 ¶ 127. Dillard's description of his RH cell is set forth fully above. *See also id.* ¶¶ 126-137. While his RH confinement conditions are sufficiently atypical and significant in the Fourteenth Amendment context to show a clearly established liberty interest entitling him to due process, those conditions are not sufficiently serious in the Eighth Amendment context to invoke the Cruel and Unusual Punishment Clause.

Dillard does not indicate his RH cell lacks basic hygiene elements. *See id.*; *see also Daigre v. Maggio*, 719 F.2d 1310, 1312 (5th Cir. 1983) (noting "the record does not establish that [the inmate's] isolation cell is generally unsanitary"). Dillard suggests the facts of meal and exercise deprivations suffice. ECF No. 86 ¶ 137. Those facts are separately actionable as discussed above, but they do not render the isolated, solitary, or prolonged nature of his confinement unconstitutional under clearly established Eighth Amendment law. Absent egregious hygiene-related facts like Dillard's cell being swamped with mold, feces, or urine, *see Hope*, 861 F. App'x at 584, or Dillard's being forced to sleep on a cold floor with rats crawling over him, *see Foulds*, 833 F.2d at 54, Dillard's claim falls short under the Eighth Amendment. By extension, Dillard cannot show the defendants' subjecting him to such confinement is objectively unreasonable, so as to overcome their assertion of qualified immunity. Summary judgment thus is proper on this point.

### e.    Inadequate medical care relating to COVID-19

It is clearly established that "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) (explaining "the government's obligation to provide medical care for those whom it is punishing by incarceration"). In January 2021, Dillard contracted COVID-19 while in RH. *See* ECF No. 86 ¶ 122. Dillard claims he has a "higher risk" of contracting the virus because of underlying medical conditions. ECF No. 21 at 4 ("I have chronic health problems—my heart only functions at 46%, my body mass index is above 40 and I have been diagnosed with hyper-tension."). He says the defendants could have mitigated that risk by properly implementing TDCJ's COVID-19 policies. ECF No. 86 ¶¶ 116, 125.

But according to Dillard, the defendants failed to clean and disinfect cells and common areas; inconsistently used bleach-water spray; did not conduct exposure tracking; and moved offenders who contracted COVID-19 near Dillard's RH cell. ECF No. 86 ¶¶ 118-21. Concurrently, Dillard contracted the virus, lost his senses of smell and taste, developed a dry cough, and "began experiencing agonizing chest pains." *Id.* ¶ 122. A TDCJ nurse visited Dillard and told him to let her know "if it got worse," but he apparently never received any care from her or anyone after contracting the virus. *Id.* ¶ 123. For "at least (10) ten days without reprieve," Dillard everyday "awoke full of sweat" and in physical pain, he "could not get out of bed and had to sleep on his stomach to be able to breath[e]," and "was under the impression that he would die in the cell." *Id.* ¶¶ 122, 124. Although he generally recovered, he still "has not regained his full sense of smell and taste." *Id.* ¶ 125.

The undersigned assumes, without deciding, Dillard has at least raised a fact issue concerning the adequacy of medical care he received given his risk of contracting, and actual contraction, of COVID-19. He so far avoids summary judgment on this point.

### f.    Conclusion on Objective Component

The Court should grant summary judgment against Dillard on his conditions-of-confinement claims relating to inadequate showers and prolonged, solitary-like confinement, because he does not show they amount to sufficiently serious conditions under clearly established Eighth Amendment law. The Court should review the remaining claims—meal and exercise deprivations, and inadequate medical care relating to COVID-19—under the Eighth Amendment's subjective component.

### 2.    Eighth Amendment: Subjective Component

Dillard must carry his summary judgment burden on both Eight Amendment components. *Davis*, 157 F.3d at 1006. Below, the undersigned considers the subjective component with attention to each defendant whom Dillard seeks to hold liable.

### a.    James Bullard, Jayton Chavers, Dakota Denney, and Gregory Fredricks

As discussed more in the First Amendment section, these defendants have been the most involved in allegedly depriving Dillard of meals and exercise. *See* ECF No. 86 ¶ 76 ("Bullard, Chavers, Denney, and Fredricks are the officers who were the most persistent in the deprivations, and continuously taunted [Dillard]."). The evidence of their retaliatory conduct in the First Amendment context suffices here to supply the "sufficiently culpable state of mind" required in the Eighth Amendment context. *See Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297).

That evidence—including their frequent references to Dillard as a "snitch" and acknowledgement that Dillard is "not such a big boy anymore"—suggests the defendants knew

Dillard was losing a substantial and unhealthy amount of weight, drew the inference that such a substantial risk of serious harm existed, and disregarded the risk. *See Cleveland*, 938 F.3d at 676; *see also Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."). In fact, that evidence suggests these defendants acted "for the very purpose of causing harm or with knowledge that harm [would] result" to Dillard, both of which are higher culpable mental states than deliberate indifference. *Farmer*, 511 U.S. at 835. The "'Eighth Amendment always stands as a protection against' such 'calculated harassment unrelated to prison needs.'" *Harper*, 174 F.3d at 720 (quoting *Hudson v. Palmer*, 468 U.S. 517, 530 (1984)).

A reasonable jury could find Bullard, Chavers, Denney, and Fredricks acted either purposefully, knowingly, or with deliberate indifference when they deprived Dillard of meals and exercise, resulting in Dillard's 130-pound weight loss. The same jury could find further that these defendants' conduct was objectively unreasonable under clearly established Eighth Amendment law. *See also Malley*, 475 U.S. at 341 (again, stating qualified immunity does not protect "those who knowingly violate the law"). The Court should deny these defendants summary judgment on Dillard's Eighth Amendment claim.

### b.    Lorie Davis, Jimmy Smith, Elbert Holmes, Andrea Lozada, and Timothy Washington

Dillard seeks judgment from these defendants for their deliberate indifference to (i) their co-defendants' meal and exercise deprivations and (ii) Dillard's risk of contracting, and actual contracting of, COVID-19. ECF No. 86 ¶¶ 146-47, 153, 156, 158.

### i.    Meal and Exercise/Recreation Deprivations

Dillard declares these defendants knew about the meal and recreation deprivations yet did nothing. *Id.* ¶¶ 84 (Dillard speaking with Washington about his confinement conditions), 105

("Davis, Smith, Holmes and Lozada learned of the . . . deprivations through [Dillard's] extensive grievance filing, letters to them, oral complaints and civil action."); *see also id.* ¶¶ 102, 104. According to Dillard, "Davis, Smith, Holmes, Lozada, and Washington made a conscious decision to allow [Dillard] to be held in [RH] . . . under conditions that consisted of defendants Bullard, Chavers, Denney, and Fredricks engaging in predictable, preventable and repeated deprivations of meals, showers, and exercise (recreation)." *Id.* ¶ 101; *see also id.* ¶ 103.

Similar to Dillard's Fourteenth Amendment claim, a reasonable jury could find Davis, Smith, Holmes, Lozada, and Washington affirmatively participated in an Eighth Amendment violation because they knew Dillard was losing a substantial and unhealthy amount of weight through letters, grievance filing, or personal encounters; drew the inference that a substantial risk of serious harm existed for Dillard; and disregarded the risk. *See Cleveland*, 938 F.3d at 676. A reasonable jury could find further that such conduct was objectively unreasonable. *See Scribner*, 232 F. App'x at 396 (denying qualified immunity to supervisory official who had not denied receiving inmate's letters complaining of cruel and unusual punishment). Accordingly, the Court should deny them summary judgment on this point.

There is an additional theory of liability relating to unconstitutional policy implementation. Dillard claims the RHP, which Davis, Smith, Holmes, and Lozada (but not Washington) promulgated and enforced (ECF No. 86 ¶ 97), gives officers unfettered discretion to deny inmates meals and recreation. ECF No. 86 ¶ 109. Again, the defendants have not proffered the RHP for the Court's review or otherwise spoken to the nature of Dillard's confinement. A reasonable jury could similarly find Davis, Smith, Holmes, and Lozada liable under this theory.

### ii. COVID-19

Although the undersigned assumes Dillard satisfies this claim's objective component, Dillard does not show a genuine dispute of material fact concerning these defendants' subjective deliberate indifference, for two reasons. First, he acknowledges the defendants acted to prevent COVID-19's spread. *See Farmer*, 511 U.S. at 845 (stating "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause"). Dillard recognizes the defendants "shut down visits and offender programing" (ECF No. 86 ¶ 121), imposed transportation restrictions (ECF No. 21 at 3), provided "extra bars of soap" (*id.*), gave him a cloth mask (*id.*), and distributed two-to-three grams of powdered bleach once or twice weekly. *Id.*; *see United States v. Wright*, No. 3:06-cr-00252-N(1), 2020 WL 6710802, at *3 (N.D. Tex. Nov. 13, 2020) (stating prison officials are not deliberately indifferent "when they take affirmative steps to contain [COVID-19] such as cleaning common areas, providing inmates and staff with masks, and giving inmates cleaning supplies").

Second, Dillard does not assert facts indicating Davis, Smith, Holmes, Lozada, or Washington knew (leading up to January 2021 when this sequence unfolded) that Dillard was at a heightened risk of contracting, or that he in-fact contracted, COVID-19. Unlike with his complaints of meal and exercise deprivations and indefinite RH, the only person with whom Dillard specifically mentions communicating about COVID-19 and his symptomology was his TDCJ nurse, *see* ECF No. 86 ¶ 123, who Dillard does not sue here. *See Johnson v. Davis*, No. cv-19-734-SDD-SDJ, 2020 WL 4249649, at *4 (M.D. La. July 20, 2020) ("Because Plaintiff has failed to name as a defendant any individual who refused to allow him to obtain medical assistance, this claim must fail."), *rec. adopted*, 2020 WL 4231582 (M.D. La. July 23, 2020). Dillard's COVID-19 claim thus falls short because he cannot show these defendants acted with deliberate

indifference, for the two reasons discussed above. By extension, Dillard cannot show these defendants' alleged misconduct was objectively unreasonable given their assertion of qualified immunity. Summary judgment thus is proper on this point.

      **c.**      **Bobby Lumpkin, Jimmy Smith, Michael Feazell, Timothy Hooper**

As analyzed above, Dillard may pursue prospective relief from the defendants sued in their official capacities. *See Valentine*, 993 F.3d at 280. Accordingly, Lumpkin should remain a party, but the Court likewise should dismiss Dillard's Eighth Amendment official-capacity claims against Smith, Feazell, and Hooper.

      **d.**      **Conclusion on Subjective Component**

The Court should grant summary judgment against Dillard on his Eighth Amendment claim relating to COVID-19, and on his official-capacity claims against Smith, Feazell, and Hooper. But there remain genuine disputes of material fact concerning his meal and exercise deprivation claims, which survive the defendants' assertion of qualified immunity at the summary judgment phase.

**D.**      **Dillard's Requested Relief**

Dillard requests monetary, declaratory, and injunctive relief. ECF No. 86 at 27-30. Defendants raise various challenges to Dillard's ability to recover such relief, which the undersigned addresses below.

      **1.**      **Money Damages**

Dillard requests $210,000 from Defendants to compensate him for "physical, psychological and emotional injuries" sustained because of the constitutional violations he asserts. *Id.* at 29-30. He requests $30,000 in punitive damages for the same violations. *Id.* at 30. He also requests damages from Mares, Smalley, and McLemore (*id.* at 29-30), but these requests are moot, as the Court has dismissed these persons from this case with prejudice. *See* ECF No. 207.

To the extent Dillard's requested relief relates to the Eighth Amendment claims for which summary judgment is proper, the Court should deny his requests. Defendants further challenge Dillard's ability to recover on grounds of sovereign immunity and the Prison Litigation Reform Act ("PLRA"). ECF No. 124 at 13-15, 27.

### a.    Sovereign Immunity

Defendants submit Dillard's "claims against Defendants for monetary damages in their official capacity are barred by the Eleventh Amendment." ECF No. 124 at 11. The sovereign immunity doctrine, derived from the Eleventh Amendment, "is the privilege of the sovereign not to be sued without its consent." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011). It is inapplicable where, as here, the defendants from whom Dillard seeks relief are sued in their individual capacities. *See Lewis v. Clarke*, ___ U.S. ___, ___, 137 S. Ct. 1285, 1293 (2017) ("Nor have we ever held that a civil rights suit under 42 U.S.C. § 1983 against a state officer in his individual capacity implicates the Eleventh Amendment and a State's sovereign immunity from suit."). All the defendants whom Dillard sues for money damages are properly named in their individual capacities. *See* ECF No. 86 ¶¶ 9-18; *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (explaining "an award of damages against an official in his personal capacity can be executed only against the official's personal assets"). Defendants' first challenge to Dillard's claims for monetary relief thus falls short.

### b.    The PLRA

Under the PLRA, "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The PLRA "applies to all federal civil actions in which a prisoner alleges a constitutional violation, making compensatory

damages for mental or emotional injuries non-recoverable, absent physical injury." *Geiger v. Jowers*, 404 F.3d 371, 375 (5th Cir. 2005). "A physical injury is an observable or diagnosable medical condition requiring treatment by a medical care professional." *Luong v. Hatt*, 979 F. Supp. 481, 486 (N.D. Tex. 1997). The injury "must be more than *de minimis*, but need not be significant." *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997).

Defendants contend the PLRA bars Dillard from recovering money damages because he "seeks damages solely for mental and emotional suffering." ECF No. 124 at 27. Dillard insists he has "suffered physical injury in the form of 135 [pounds] of weight loss." ECF No. 168 at 9.

Substantial weight loss likely satisfies the PLRA's physical injury requirement. *See Atomanczyk v. Tex. Dep't of Crim. Just.*, No. cv-H-17-0719, 2018 WL 3122324, at *4 (S.D. Tex. June 26, 2018) (citing *Pratt v. Corr. Corp. of Am.*, 124 F. App'x 465, 467 (8th Cir. 2005)) ("Although the Fifth Circuit has not addressed [it], at least one circuit court of appeals has held that substantial weight loss stemming from an inadequate diet satisfies the physical injury requirement found in § 1997e(e) . . . ."); *see also Cooper*, 929 F.2d at 1082 ("In fact, [Plaintiff] alleged harm by stating that he had suffered 'substantial weight loss.'"). *But see Amir-Sharif v. Dall. Cnty.*, No. 3:06-cv-0143-K, 2006 WL 2860552, at *7 (N.D. Tex. Oct. 5, 2006) ("Sleep deprivation, headaches and weight loss amount to de minimis physical injuries without more," such as evidence the inmate "suffered from side effects which required medical attention as a result of the above conditions.").

Dillard's triple-digit weight loss—assuming at trial he can prove such an amount and sufficient causation—is substantial and surpasses the PLRA's *de minimis* threshold. *Atomanczyk*, 2018 WL 3122324, at *5 (acknowledging the inmate still "will have to prove the requisite physical injury to recover at trial"). The extent of Dillard's physical injuries also remains unclear, as

Defendants do not attach his complete medical records to their motion or otherwise proffer any evidence probative of Dillard's health. *See Amir-Sharif*, 2006 WL 2860552, at *7 (suggesting additional evidence of related "side effects" that require "medical attention" would impact the analysis). For example, in *Mejia*, the relevant injury from meal and exercise deprivations was not just weight loss, but also bowel problems and high blood pressure. *See Mejia*, 2016 WL 11473812, at *10 (discussing blood pressure separately from inmate's mental and emotional injuries), *rec. adopted*, 2016 WL 3661902, at *3 ("Significant weight loss and bowel problems caused by insufficient nutrition can state a constitutional violation."). At trial, medical evidence could reveal physical injuries not yet apparent, and such evidence would seem to be within Defendants' possession. Summary judgment is improper on this point.

Even if Dillard ultimately falls short in proving a physical injury, the PLRA does not bar him from recovering nominal or punitive damages. *Hutchins v. McDaniels*, 512 F.3d 193, 197-98 (5th Cir. 2007); *see also Cowart v. Erwin*, 837 F.3d 444, 455 (5th Cir. 2016) (stating a "jury may award punitive damages in a § 1983 action"); *Smith v. Wade*, 461 U.S. 30, 51-52 (1983) (explaining § 1983 legal standards for punitive damages). Nor does it preclude him from recovering declaratory or injunctive relief. *Harper*, 174 F.3d at 719 & n.7.

### 2.    Declaratory and Injunctive Relief

Dillard requests ten items of declaratory relief (ECF No. 86 at 27-28), which Defendants contend should be dismissed because Dillard's "pleading is so deficient." ECF No. 124 at 27. Defendants do not explain why any request is deficient, especially considering the Court's liberal construction of *pro se* inmate pleadings. *See Estelle*, 429 U.S. at 106. Dillard also requests ten items of injunctive relief (ECF No. 86 at 28-29), which Defendants contend should be dismissed because Dillard "has not alleged a violation of a constitutional right," he "fails to demonstrate how

an injunction would correct [any] violation," and his requests are otherwise insufficiently tailored. ECF No. 124 at 25-26. However, Dillard carries his summary judgment burden in showing constitutional violations. And this argument is premature because Dillard must first show he "has succeeded on the merits" to obtain a permanent injunction. *Valentine*, 993 F.3d at 280. While Dillard raises fact issues concerning his claims, his success on the merits remains pending. If Dillard prevails at trial, then Chief Judge Lynn will properly adjudicate which of Dillard's requests for injunctive and declaratory relief are sufficiently remedial and tailored, if any. The Court should deny Defendants summary judgment on Dillard's claims for declaratory and injunctive relief.

The undersigned makes three additional recommendations. First, Dillard seeks relief "for himself and all similarly situated individuals." ECF No. 86 at 27, Req. No. A1. Dillard, who is the only plaintiff in this lawsuit, lacks standing to seek relief on behalf of anyone other than himself. *See Barrows v. Jackson*, 346 U.S. 249, 255 (1953) ("Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party."). To the extent he requests relief on behalf of other inmates, the Court should deny those requests and dismiss any corresponding claims. *See* ECF No. 86 at 27-28, Req. Nos. A1, A2, A4, B1, C4.

Second, the Court should strike Request Nos. B2 (seeking transfer from Allred) and B4 (concerning property return) because they are moot, as Dillard is no longer on the Allred Unit and the persons who allegedly deprived him of his property are Mares, Smalley, and McLemore, who have been dismissed from the case with prejudice. *See also Dillard*, 2022 WL 1096368, *rec. adopted*, 2022 WL 1092929.

Third, Dillard requests a declaration that "prolonged solitary confinement and/or [RH] (over 2 and ½ years) is unconstitutional"; an "order ending [RH] for all offenders who have been housed in RH for over 2 and ½ years"; an injunction ordering Defendants to "Immediately release

all offenders housed in [RH] that have served 2 and ½ years in RH or any other form [of] solitary confinement or isolation"; and an injunction "[p]ermanently enjoin[ing] defendant[]s and/or their agents (or their successors) from housing offenders in [RH] or any other form of isolation and/or solitary confinement for prolonged or long-terms or indefinitely." ECF No. 86 at 28-29, Req. Nos. A4, A10, B1, C4. If Dillard prevails at trial, the Court may consider modifying or denying these requests because they are too broad. In addition to the standing issue, they implicate Dillard's Eighth Amendment claim relating to prolonged, solitary-like confinement. As discussed above, such confinement is not unconstitutional per se, but may be found unconstitutional at trial based upon the evidence presented to the jury that the confinement was made without due process of law. *See Zinermon*, 494 U.S. at 125. While Dillard's invoking "two and a half years" is probative in the Fourteenth Amendment context, this durational fact is of no consequence for him in the Eighth Amendment context.

### E.    The Motion to Intervene

The Court should deny Jeremy Busby's Motion to Intervene (ECF No. 189) because it is untimely and does not identify a proper statute entitling Busby to intervene. Busby seeks to intervene "as of right" (*see id.* at 1) under Federal Rule of Civil Procedure 24, which provides: "On *timely* motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute." Fed. R. Civ. P. 24(a)(1) (emphasis added). Dillard filed this lawsuit in July 2019. ECF No. 1. Busby filed his motion in February 2022. ECF No. 189. Because Busby filed this motion roughly two-and-a-half years after this litigation began, his motion is untimely under Rule 24(a). Further, Busby apparently identifies 42 U.S.C. § 1997a as the federal statute entitling him to intervention. ECF No. 189 at 1. But § 1997a does not give prisoners a right to intervene. It authorizes the Attorney General to sue a State that subjects "persons residing in or

confined to an institution ... to egregious or flagrant conditions which deprive such persons of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 42 U.S.C. § 1997a(a). Because Busby does not identify any federal statute entitling him to intervention, there is no basis under Rule 24(a)(1) for the Court to grant his motion. The Court should thus deny his motion for both reasons.

## IV.    CONCLUSION

Viewed in the light most favorable to Dillard, the evidence is such that a reasonable jury could find for him on some, but not all, of his claims. Accordingly, the undersigned **RECOMMENDS** that Chief Judge Lynn **DENY** Dillard's Motion for Partial Summary Judgment (ECF No. 152) and partially **GRANT** and **DENY** Defendants' Motion for Summary Judgment (ECF No. 124), consistent with the discussion above and as follows.

The Court should **GRANT** summary judgment against Dillard on his following claims: (1) Eighth Amendment claims relating to inadequate showers, prolonged solitary-like confinement, and COVID-19; (2) all claims against Michael Feazell and Timothy Hooper; (3) official-capacity claims against Jimmy Smith; and (4) all claims that Dillard brings solely on behalf of similarly situated individuals. The Court should **DISMISS** these claims **with prejudice**. Except as provided in this paragraph, Defendants' Motion for Summary Judgment (ECF No. 124) should be **DENIED.**

The undersigned further **RECOMMENDS** the Court **SET** this case for trial, on the following of Dillard's claims: (1) First Amendment retaliation, as to defendants McGee, Miller, Bullard, Chavers, Denney, Fredricks, Davis, Smith, Holmes, Lozada, Washington, and Lumpkin; (2) Eighth Amendment conditions-of-confinement, as to defendants Bullard, Chavers, Denney, Fredricks, Davis, Smith, Holmes, Lozada, Washington, and Lumpkin; and (3) Fourteenth

Amendment procedural due process, as to Reitsma, Davis, Smith, Holmes, Lozada, Washington, and Lumpkin.

Finally, the Court should **DENY** Jeremy Busby's Motion to Intervene. ECF No. 189.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). To be specific, an objection must identify the particular finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

**SIGNED** on June 17, 2022.

Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE